# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **FABIAN HERNANDEZ,** | § | |
| **TDCJ No. 999553** | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | |
| | § | **EP-15-CV-51-PRM** |
| **LORIE DAVIS, Director,** | § | |
| **Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division,** | § | |
| **Respondent.** | § | |

## MEMORANDUM OPINION AND ORDER

On this day, the Court considered Petitioner Fabian Hernandez's

"First Amended Petition for a Writ of Habeas Corpus" (ECF No. 34)[1]

[hereinafter "Amended Petition"] filed on January 27, 2016; Respondent

Lorie Davis's "Answer with Brief In Support" (ECF No. 46) [hereinafter

"Answer"], filed on June 8, 2016; and Petitioner's "Reply to

Respondent's Answer" (ECF No. 49) [hereinafter "Reply], filed on July

28, 2016, in the above-captioned cause.

---

[1] "ECF No." refers to the Electronic Case Filing number for documents docketed in this case. Where a discrepancy exists between page numbers on filed documents and page numbers assigned by the ECF system, the Court will use the latter page numbers.

Pursuant to 28 U.S.C. §§ 2241(d), 2254, Petitioner challenges the death sentence that the state trial court imposed in his case after a jury found him guilty of capital murder.  The Texas Court of Criminal Appeals affirmed his conviction and sentence,[2] and denied his petition for state habeas relief.[3]  For the reasons discussed below, the Court concludes that Petitioner is entitled to neither federal habeas corpus relief nor a certificate of appealability.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Guilt-Innocence Phase of Trial

Evidence presented during the guilt-innocence phase of Petitioner's trial revealed the following factual scenario.

Petitioner became romantically involved with Rene Urbina (Urbina Hernandez)[4] and together they had two children.  66 Rep. R. 63.  Petitioner and Urbina Hernandez had a tumultuous relationship,

---

[2] *Hernandez v. State*, 390 S.W.3d 310 (Tex. Crim. App. 2012), *cert. denied*, 134 S.Ct. 823 (2013).

[3] *Ex Parte Hernandez*, No. WR-81,577-01, 2015 WL 376357 (Tex. Crim. App. Jan. 28, 2015).

[4] Rene Urbina adopted Petitioner's name once she married Petitioner, changing her name to Rene Urbina Hernandez.

which led to several brief periods of separation. 66 Rep. R. 303–305; 67 Rep. R. 68–70; 69 Rep. R. 15–17, 28. Petitioner and Urbina Hernandez eventually married on March 23, 2004. 66 Rep. R. 67; 69 Rep. R. 17; 69 Rep. R. 12. Their relationship remained tumultuous, however, and they permanently separated in April of 2006. 66 Rep. R. 61; 67 Rep. R. 68.

On November 2, 2006, Petitioner encountered Diesta Dee Torres, an acquaintance of over twelve years, at an El Paso bar at approximately 10:00 p.m. 66 Rep. R. 271, 275. Petitioner, who had been consuming alcohol, confided in Torres regarding his deep sadness about the course of his life, and his concern for his estranged wife and their children. 66 Rep. R. 276–77; 67 Rep. R. 8. Petitioner and Torres left the bar together, and Petitioner asked Torres to drive him to a nearby hotel, where Petitioner planned to spend the night. 66 Rep. R. 278–80. As Torres drove Petitioner to the hotel, Petitioner asked Torres to let him exit the vehicle at an intersection within walking distance from Urbina Hernandez's home. 66 Rep. R. 272, 280–92, 294; 68 Rep. R. 14. At that time, Urbina Hernandez lived with her mother and two children. 66 Rep. R. 272, 294; 68 Rep. R. 14.

That same evening, Urbina Hernandez's sister, Cynthia Estevez, was waiting at the Urbina Hernandez residence for Urbina Hernandez to return home. 66 Rep. R. 38–44. A little after two o'clock in the morning of November 3, 2006, Estevez heard three gunshots in fairly rapid succession outside of the house. *Id.* at 46, 66–67. When Estevez went outside to investigate, she saw the body of her sister's friend, Arturo Fonseca, lying prone on the ground at the curb between two parked vehicles. *Id.* at 57–58, 129–30. As Estevez rushed back inside to call for emergency-medical assistance, her mother passed by her and exited the house. *Id.* at 49. When Estevez returned outside, she saw her mother crying over another body lying supine on the road, which she recognized as her sister, Urbina Hernandez. *Id.* at 49–52.

A neighbor, Isela Cordero, woke up at approximately 2:20 a.m. that morning to care for a sick child. *Id.* As she returned to her bedroom, she heard some "pops" outside, peered out her living room window, and saw a white, two-door Honda driving away slowly. 66 Rep. R. 95–99.

Crime scene technicians from the El Paso Police Department

arrived at the scene and recovered three shell casings coated with an unusual green lacquer sealant.  66 Rep. R. 156; 67 Rep. R. 120–22.  The Medical Examiner confirmed during an autopsy that Urbina Hernandez died from a gunshot to her forehead, fired at point blank range, which killed her almost immediately.  66 Rep. R. 167–79.  The Medical Examiner also confirmed that Fonseca died from a close range gunshot to the back of his head, which exited through his left temple.  *Id.* at 182–92.

At approximately four o'clock that morning, Petitioner arrived at the trailer home of his life-long friend, Sergio Carrasco; Carrasco lent his car keys to Petitioner and provided Petitioner with some blankets before going back to sleep.  67 Rep. R. 39–43, 51–53, 57–58.  Petitioner left the trailer home before Carrasco arose again to get ready for work.  *Id.* at 82, 92.

Carrasco went to work that morning, but he returned home during his lunch break.  When he did, he noticed a white, two-door Honda parked behind his trailer, covered with the same blankets that he had provided Petitioner earlier that morning.  *Id.* at 56.  After Carrasco

returned to work, detectives contacted him and asked him to return to his trailer home. *Id.* at 63. When Carrasco arrived, law enforcement officers had already determined that the car parked behind the trailer belonged to Fonseca. 66 Rep. R. 209, 218, 225.

Law enforcement officers were also dispatched to Petitioner's father's residence, where they found Petitioner. 26 Rep. R. 14–18, 20–31, 38–63; 27 Rep. R. 55–56, 65. Based on information that Petitioner provided, officers also discovered a .380 caliber semi-automatic handgun and a box of ammunition with a distinctive green sealant over the primer in Petitioner's father's house. 66 Rep. R. 236–41; 67 Rep. R. 120–22; 68 Rep. R. 50–55. A Department of Public Safety forensic firearms examiner confirmed that all of the shell casings discovered at the murder scene were fired from the same weapon recovered from Petitioner's father's residence. 67 Rep. R. 101–25.

At the conclusion of the guilt-innocence phase of trial, the jury found Petitioner guilty beyond a reasonable doubt of the capital murders of Urbina Hernandez and Fonseca, as charged in the indictment. 68 Rep. R. 152.

## B.    Punishment Phase of Trial

The prosecution sought a death sentence in Petitioner's case.[5]  To

secure a death sentence, the prosecution relied on Petitioner's affiliation

with the Barrio Azteca criminal enterprise.[6]  69 Rep. R. 60–74; 70 Rep.

---

[5] "[O]nce a defendant is convicted of capital murder, he becomes *eligible* for the death penalty only if the State seeks a separate sentencing hearing." *Sonnier v. Quarterman*, 476 F.3d 349, 366 (5th Cir. 2007) (emphasis in original).  After hearing the evidence at the sentencing hearing, the jury is first asked "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" (i.e., "future dangerousness special issue").  Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) (West 2017).  In deliberating on this interrogatory, the jury "shall consider all evidence admitted at the guilt or innocence stage and the punishment stage, including evidence of the defendant's background or character or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty."  *Id.* § 2(d)(1).  If the jury returns a unanimous affirmative finding as to the first issue, it must then consider:  "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed" (i.e., mitigation special issue).  *Id.* § 2(e)(1).

[6] "The Barrio Azteca was a violent paramilitary gang originally organized by prisoners from El Paso, Texas, to protect its members, fight rival gangs, generate profits by importing and distributing controlled substances, and collect 'quotas' or fees from others selling drugs in its territory."  *Galindo v. United States*, No. EP-CR-2213-KC-13, 2016 WL 5956076, at *1 (W.D. Tex. 2016).

R. 94–158.  A gang intelligence officer with the El Paso County Sheriff's Department, Officer Jose Soria, testified that Petitioner was a confirmed Barrio Azteca member.  69 Rep. R. 64, 71–72.  The prosecution also relied on a letter Petitioner wrote while in jail and awaiting trial, which called for fellow Barrio Azteca members to murder prosecution witnesses Torres and Carrasco—both of whom were also Petitioner's long-time friends.  69 Rep. R. 81–91; 70 Rep. R. 7, 27–35, 150–56.  Officer Soria explained that the letter was addressed to another known Barrio Azteca member and was signed "Spook," Petitioner's gang moniker.  69 Rep. R. 83, 89–90.  In addition to this letter, the prosecution introduced other letters in which Petitioner sought to have other individuals assaulted in retaliation for their actions against the Barrio Azteca.  70 Rep. R. 124–49.

The prosecution also presented evidence that Petitioner had a prior conviction in New Mexico for manslaughter when he was eighteen years of age, and two prior convictions in Texas for misdemeanor theft. 70 Rep. R. 124; 71 Rep. R. 41–49; 72 Rep. R. 89–90, 109, 116, 124–33, 173.

In an effort to avoid a death sentence, defense counsel presented evidence explaining the circumstances of Petitioner's manslaughter conviction.  71 Rep. R. 41–49; 72 Rep. R. 125–33.  Petitioner's sister, Diane Hernandez Valdez, testified that the conviction resulted from an altercation in which she was involved with other individuals.  71 Rep. R. 41–45.  She testified that Petitioner only became involved in response to a direct challenge.  71 Rep. R. 41–45.  Hernandez Valdez claimed she fought until she heard a gunshot.  *Id.* at 46–47.  She explained that Petitioner had shot someone in the throat.  *Id.* at 92.

A Bureau Chief in the New Mexico Department of Corrections, Colleen McCarney, testified about Petitioner's non-violent behavior during his incarceration for manslaughter from July 1994 through June 1996.  72 Rep. R. 42–106.  An inmate-classification expert, Frank AuBuchon, explained that the Texas Department of Criminal Justice ("TDCJ") would likely be able to control Petitioner's actions in prison.  73 Rep. R. 5–84.  A forensic psychologist, Dr. Mark Douglass Cunningham, testified, based on his statistical analysis and review of Petitioner's records, that there was a "very low risk" that Petitioner

would commit acts of violence while in prison.  74 Rep. R. 217–29, 274–306.

Defense counsel also presented testimony from several family members and friends regarding Petitioner's disadvantaged childhood, which included evidence that his father was an alcoholic who failed to provide guidance during Petitioner's formative years and was verbally abusive toward Petitioner's mother.  71 Rep. R. 29–35, 120–23, 145–56, 185–86, 205–12, 238–40, 268–80; 72 Rep. R. 20–24; 74 RR 237–58.

Petitioner's family and friends also testified that Urbina Hernandez was verbally abusive toward Petitioner.  71 Rep. R. 51–57, 175, 224–27, 237–42; 72 Rep. R. 24–31, 140–43; 74 Rep. R. 260.  The defense presented testimony that Urbina Hernandez was condescending toward Petitioner and would insult, embarrass, and humiliate him in front of his family; specifically, Urbina Hernandez would call him names in front of his family, yell obscenities at him in front of their children, throw items, and mistreat Petitioner in front of his mother. 71 Rep. R. 57, 224–26; 72 Rep. R. 142–43; 74 Rep. R. 260.

Another major component of Petitioner's mitigation case involved

his alleged impaired intellectual development and deficiencies. Petitioner's mother testified that she had poor nutrition during her pregnancy with him. 74 Rep. R. 248–49. She also testified that when Petitioner was six or seven years old, he contracted scarlet fever and was in the hospital for almost a month. *Id.* at 251–53, 267–68. During that time, Petitioner also developed meningitis, and the doctor informed Petitioner's mother that Petitioner developed mental health problems as a result of the illness. *Id.* at 252. When Petitioner returned home from the hospital, his mother noticed that he was "quieter" and "slower"; as a result, Petitioner's mother placed Petitioner in special education classes. *Id.* at 252–53. According to Dr. Cunningham, these adverse factors affected Petitioner's "coping capacity," which he described as the amount of stress a person can bear before "doing something stupid." *Id.* at 111–16.

Dr. Cunningham further testified that Petitioner suffered from an "intellectual deficiency" and had "deficient intelligence." *Id.* at 108, 114, 121–22, 133–36. He described Petitioner's overall intelligence and intellectual abilities as being in the lower zone of the intelligence

continuum toward intellectual disability. *Id.* at 159–60. As a result of this diminished "intellectual horsepower," Dr. Cunningham explained that Petitioner could not understand notions "with the same quality and awareness that you do when you have an intact mind." *Id.* at 163–64.

In summation, defense counsel argued to the jury that, based on the testimony from McCarney, AuBuchon, and Cunningham, the State failed to show that Petitioner would be a continuing threat to society, since he would be incarcerated for the rest of his life, and TDCJ would be able to prevent Petitioner from committing future acts of violence in prison. 75 Rep. R. 93–96, 106–11, 119–22, 129–31.

After the punishment phase of Petitioner's trial, the jury unanimously concluded beyond a reasonable doubt that there was a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society. Additionally, after taking into consideration all of the evidence—including the circumstances of the offense, Petitioner's character and background, and Petitioner's personal moral culpability—the jury further

determined that no sufficient mitigating circumstances warranted imposing a life sentence rather than a death sentence. 76 Rep. R. 5–6. The same day, the state trial court imposed a sentence of death in accordance with state law. 76 Rep. R. 9–14.

## C.    Direct Appeal

After the state trial court imposed the death sentence, Petitioner appealed. He argued that the state trial court erred when it

(1)    refused to permit defense counsel to ask the jury venire questions regarding their views on whether specific types of evidence would constitute mitigating evidence for the purpose of allowing them to make challenges for cause and inform [counsel's] use of peremptory challenges;

(2)    denied defense counsel's challenges for cause of six venire members;

(3)    granted the prosecution's challenges for cause of two venire members;

(4)    ordered a mental health examination of Petitioner by [Dr. Richard E. Coons] after defense counsel had him tested for mental retardation without first limiting the prosecution expert's examination to the issue of measures of intelligence; and

(5)    excluded, during the punishment-phase of trial, the Petitioner's proffered testimony of Urbina Hernandez's drug abuse and promiscuity.

Appellant's Br. iii-v, AP 76,276.

The Texas Court of Criminal Appeals affirmed Petitioner's conviction and sentence in an opinion issued on November 21, 2012. *Hernandez v. State*, 390 S.W.3d 310 (Tex. Crim. App. 2012). The United States Supreme Court denied Petitioner's petition for writ of certiorari on December 16, 2013. *Hernandez v. Texas*, 134 S.Ct. 823 (2013).

**D.  State Habeas Corpus Proceedings**

After exhausting his state appellate remedies, Petitioner filed an application for state habeas corpus relief on February 2, 2012, asserting that both his trial and appellate counsel rendered ineffective assistance and that the state trial court committed error.

First, Petitioner alleged that his trial counsel rendered ineffective assistance by failing to

> (1)  object to the testimony of prosecution mental health expert [Dr. Coons];
>
> (2)  raise Fifth and Eighth Amendment challenges to the state trial court's pretrial ruling requiring Petitioner to submit to evaluation by prosecution mental health expert, Dr. Coons, if he wished to introduce the testimony of defense mental expert, Dr. Luiz Natalicio, regarding his alleged low intellectual level;

(3)     permit the examination of Petitioner by Dr. Coons conditioned upon Dr. Coons not expressing an opinion regarding Petitioner's future dangerousness;

(4)     object to the state trial court's exclusion of the testimony of defense expert . . . AuBuchon regarding Petitioner's lack of future dangerousness if sentenced to a term of life without parole;

(5)     object when the prosecution argued that the term "probability," as used in the Texas future-dangerousness capital sentencing special issue, meant "more than a mere possibility"; and

(6)     object to the absence of a provision in the punishment-phase jury charge instructing the jury that the prosecution was required to bear the burden of proving a negative answer to the mitigation special issue beyond a reasonable doubt.

1 State Habeas R. 13–14.

Petitioner also claimed that his state appellate counsel rendered ineffective assistance by failing to argue that the Texas twelve-ten rule is unconstitutional.[7]

---

[7] The so called "Texas twelve-ten rule" refers to the requirement that the state trial court "instruct the jury that it must have at least 10 'no' votes to answer 'no' on the aggravating special issue and at least 10 'yes' votes to answer 'yes' on the mitigation special issue—either of which would result in a life sentence, not death. *See Druery*, 647 F.3d at 542 (discussing the Texas twelve-ten rule).

Finally, Petitioner claimed that the state trial court erred in requiring Petitioner to submit to an examination by prosecution mental health expert Dr. Coons before allowing Petitioner to introduce the testimony of Dr. Natalicio regarding his low intellectual level.  1 State Habeas R. 13–14.

On November 19, 2012, the state trial court held an evidentiary hearing on Petitioner's claims, and Petitioner presented testimony from his former trial counsel, Jamie Gandara and Edythe Marie Payan.[8]  The state trial court then issued its findings of fact and conclusions of law and recommended that state habeas corpus relief be denied.  2 State Habeas R. 572–86.  The Texas Court of Criminal Appeals adopted all but one of the state habeas trial court's findings of fact and all but one of the trial court's conclusions of law and denied state habeas corpus relief.  *Ex parte Fabian Hernandez*, 2015 WL 376357, at *1.

---

[8] The verbatim transcription of the evidentiary hearing in Petitioner's state habeas corpus proceeding appears at State Habeas R., vol. I, pp. 401–90.  Specifically, Attorney Gandara's testimony appears at State Habeas R., vol. I, pp. 401–87, and Attorney Payan's testimony appears at State Habeas R., vol. I, pp. 489–90.

## E. Petitioner's Federal Habeas Petition

Petitioner filed the instant Amended Petition on January 27, 2016 (ECF No. 34), along with a series of exhibits. As grounds for relief in his Amended Petition, Petitioner asserts six claims:

1. Petitioner was denied effective assistance of counsel at the punishment stage of his capital murder trial because his trial counsel failed to:

    a. object when the trial court ruled that he was not allowed to introduce evidence of his low scores on standardized intelligence tests unless he waived his Fifth Amendment privilege and submitted to a comprehensive examination by the prosecution's mental health expert;

    b. permit an examination by the State's psychiatrist on the condition that the psychiatrist not express any opinion on the question of Petitioner's future dangerousness;

    c. object to the prosecution's statements during voir dire and closing argument that the term "probability," as used in Texas first capital sentencing special issue, meant "more than a mere possibility";

    d. object to the absence of an instruction in the punishment-phase jury charge instructing the jury that the prosecution was required to bear the burden of proving a negative

answer to the second capital sentencing special issue, the mitigation special issue, beyond a reasonable doubt; and

e.  adequately investigate and present available evidence (such as a brain scan) showing Petitioner suffered from organic brain dysfunction due to *in utero* exposure to alcohol and childhood head trauma.

2.  Petitioner was denied effective assistance of counsel on appeal because his appellate counsel failed to:

a.  argue that the state trial court abused its discretion when it ruled that the testimony of the State's expert satisfied the standards for scientific testimony;

b.  argue that the state trial court erred in excluding the defense expert's opinion on future dangerousness; and

c.  argue that the state trial court erred in allowing the coercive jury instruction on mitigation.[9]

---

[9] Namely, Petitioner argues that the "Texas twelve-ten rule" had a coercive effect on the jury because this rule misled the jury into believing that Petitioner would not receive a life sentence unless at least ten jurors agreed on an answer to one of the special issues, when in reality, the state trial court is required to impose a life sentence if the jury is unable to answer either special issue. *See* Am. Pet. 58–59; *see also Druery*, 647 F.3d at 542 (discussing the same argument).

3.      Petitioner's sentence violates the Fifth and Fourteenth Amendments because the state trial court did not allow him to adduce evidence of his low scores on standardized intelligence tests unless he first submitted to a comprehensive examination from the State's expert.

4.      Petitioner's sentence violates the Eighth and Fourteenth Amendments because the state trial court did not allow him to introduce evidence of his low scores on standardized intelligence tests unless he first submitted to a comprehensive examination by the State's expert.

5.      The state trial court erred in not allowing Petitioner to ask the jury panel questions regarding whether they could consider specific kinds of mitigating evidence in determining the mitigation special issue because such questions could have led to challenges for cause, pursuant to the Sixth, Eighth, and Fourteenth Amendments.

6.      The state trial court erred in not allowing Petitioner to ask the jury panel questions regarding whether they could consider specific kinds of mitigating evidence in determining the mitigation special issue because such questions could have assisted in the effective utilization of peremptory challenges, pursuant to the Sixth, Eighth, and Fourteenth Amendments.

Am. Pet. 2–76.

Respondent thereafter filed her Answer on June 8, 2016, and Petitioner filed his Reply on July 28, 2016.

## II. STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs the Court's review of Petitioner's claims for federal habeas corpus relief. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "imposes a highly deferential standard of review for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam)).

### A. Claims Adjudicated in State Court

A federal habeas court presumes that claims raised in state-court proceedings have been adjudicated "on the merits in the absence of any indication or state-law procedural principles to the contrary." *Johnson v. Williams*, 133 S.Ct. 1088, 1094 (2013). It reviews adjudicated claims under 28 U.S.C. § 2254(d). *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011). A federal habeas court's review under § 2254(d) "is limited to

the record that was before the state court." *Cullen v. Pinholster*, 563

U.S. 170, 181 (2011). It may not grant habeas relief unless the state

court adjudication of the claim

> (1) resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly
> established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light
> of the evidence presented in the State court
> proceeding.

28 U.S.C. § 2254(d); *Brown v. Payton*, 544 U.S. 133, 141 (2005);

*Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

The "contrary to" and "unreasonable application" clauses of

28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535

U.S. 685, 694 (2002). Pursuant to the "contrary to" clause, a federal

habeas court may grant relief if (1) the state court arrives at a

conclusion opposite to that reached by the Supreme Court on a question

of law or (2) the state court decides a case differently than the Supreme

Court on a set of materially indistinguishable facts. *Brown*, 544 U.S. at

141; *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) ("A state court's

decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent.'").  A state court's failure to cite governing Supreme Court authority does not, *per se*, establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of [Supreme Court] precedents, so long as neither the reasoning nor the result of the state-court decisions contradicts them."  *Mitchell*, 540 U.S. at 16 (citation omitted).

Pursuant to the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *McDaniel v. Brown*, 558 U.S. 120, 132–

33 (2010); *Wiggins*, 539 U.S. at 520–21. An "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner.").

As the Supreme Court has explained, the petitioner "must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington,* 562 U.S. at 103).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions, as of the time of the relevant state-court decision, establish

those principles.  *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004);

*Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  Pursuant to AEDPA,

what constitutes "clearly established federal law" is determined through

review of the decisions of the Supreme Court, not the precedent of other

federal courts.  *See Lopez v. Smith*, 135 S. Ct. 1, 2 (2014) (holding that

AEDPA prohibits the federal courts of appeals from relying on their

own precedent to conclude that a particular constitutional principle is

"clearly established").

   AEDPA also significantly restricts the scope of federal habeas

review of state courts' findings of fact.  Section 2254(d)(2) precludes

federal habeas corpus relief on any claim that was adjudicated on the

merits in the state court unless the state court's adjudication resulted

in a decision based on an unreasonable determination of the facts in

light of the evidence presented in the state court proceeding.  *Wood v.*

*Allen*, 558 U.S. 290, 301 (2010).  Even if reasonable minds reviewing the

record might disagree about the factual finding in question (or the

implicit credibility determination underlying the factual finding), this

does not suffice to supersede the state trial court's factual

determinations on habeas review.  *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341–42 (2006).

Moreover, § 2254(e)(1) requires that a petitioner challenging state court factual findings establish by clear and convincing evidence that the state court's findings were erroneous.  *Schriro*, 550 U.S. at 473–74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. at 338–39; *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005).[10]

However, the deference to which state-court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review.  *See Miller-El v. Dretke*, 545 U.S. at 240 (explaining that the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of

---

[10] It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2).  *See Wood*, 558 U.S. at 300 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice*, 546 U.S. at 339 (refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

A federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*).

### B.     Claims Not Adjudicated in State Court

A petitioner may not escape § 2254(d)'s deferential review by "using evidence that is introduced for the first time" in federal court. *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011). Claims without a state-court merits adjudication are subject to § 2254(e)(2)'s limitation on new evidence. *Pinholster*, 563 U.S. at 185–86. A petitioner must first prove that he "made adequate efforts during state-court proceedings to discover and present the underlying facts." *Williams*, 529 U.S. at 430.

If the petitioner was less than diligent in developing the facts, an evidentiary hearing is permissible only where (1) there is a new, retroactive rule of constitutional law, or (2) the facts could not have been discovered with due diligence and such facts demonstrate actual innocence of the crime by clear and convincing evidence. 28 U.S.C. § 2254(e)(2)(A)–(B). If, on the other hand, the petitioner did exercise diligence, a district court nevertheless has discretion to deny a hearing. *Schriro*, 550 U.S. at 468. A district court should grant a hearing only where the inmate was denied a full and fair hearing in state court and the inmate's allegations, if true, would warrant relief. *Blue*, 665 F.3d at 655. Further, a district court may deny a hearing if the federal record is sufficiently developed to make an informed decision. *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998).

## C. Ineffective-Assistance-of-Counsel Claims

The standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs ineffective-assistance-of-trial-counsel claims. To prove such a claim, a petitioner must satisfy both prongs of the *Strickland* test by showing (1) constitutionally deficient performance by counsel,

and (2) actual prejudice to his legal position.  *Id.* at 689–94; *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994).  A court need not address both components if the petitioner makes an insufficient showing on one.  *Strickland*, 466 U.S. at 697.

To demonstrate deficiency, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  A court considering such a claim "must indulge a strong presumption that counsel's representation was within the wide range of reasonable professional assistance."  *Id.* at 689.

To demonstrate prejudice, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Porter v. McCollum*, 558 U.S. 30, 38–39 (2009) (citation omitted).  A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*.  *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994).  The probability "of a different result must be substantial, not just conceivable."  *Harrington*, 562 U.S. at 112.  Thus, counsel's performance

is entitled to "a heavy measure of deference" by a reviewing court. *Cullen*, 563 U.S. at 197 (citation omitted).

Moreover, where a state court has adjudicated a petitioner's ineffective-assistance-of-counsel claims, the federal court must review those claims "through the deferential lens of § 2254(d)," *id.* at 190, and must consider not only whether the state court's determination was incorrect, but also "whether that determination was unreasonable." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Schriro*, 550 U.S. at 473). Pursuant to § 2254(d), "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* As such, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult." *Harrington*, 562 U.S. at 105. Accordingly, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

In those instances where a state court failed to adjudicate a claim under the *Strickland* test, such as when the state court summarily dismissed the claim under the Texas writ-abuse statute or the petitioner failed to fairly present the claim to the state court, a federal habeas court's review of the un-adjudicated claim is *de novo*. *See Porter*, 558 U.S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts failed to address this prong of the *Strickland* analysis); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins*, 539 U.S. at 534.

## III. ANALYSIS

### A. Grounds 3 and 4--The State Trial Court Erred When It Excluded Petitioner's Standardized Mental Health Testing Evidence.

Two of Petitioner's grounds for relief relate to the state trial court's ruling requiring that he submit to an examination by the prosecution's expert as a prerequisite to introducing his own expert testimony. Specifically, Petitioner argues that the state trial court violated his Fifth, Eighth, and Fourteenth Amendment rights when the state trial court refused to permit his trial counsel to introduce the

testimony of defense expert Dr. Natalicio—a psychologist—regarding Petitioner's scores on standardized IQ tests unless Petitioner submitted to a comprehensive examination by prosecution expert Dr. Coons—an attorney and psychiatrist—regarding Petitioner's future dangerousness. Am. Pet. 63–67. Petitioner asserts that, as a result, he "lost the opportunity to put important evidence about his mental limitations before the jury." *Id.* at 59.

### 1. State Court Disposition

Pretrial litigation concerning Petitioner's mental health lasted several months and continued into his trial. Given defense counsel's desire to introduce Dr. Natalicio's testimony, the prosecution sought to compel Petitioner to submit to an evaluation by Dr. Coons. *See* 30 Rep. R. 5–16. The state trial court held a pretrial hearing in which this matter was discussed in July of 2009. *Id.* at 5–54. During this hearing, defense counsel argued that the examination should be limited to the parameters of the defense expert's evaluation, while the prosecution sought a more robust examination. *Id.* at 17–31. The state trial court

postponed its ruling on the prosecution's motion to compel the examination. *See id.* at 54.

The following day, the state trial court held a hearing on defense counsel's motion to suppress Petitioner's statement, and Dr. Natalicio testified. 31 Rep. R. 60–156. Dr. Natalicio's testimony at this hearing consisted of his initial assessment of Petitioner's intellect and school achievement; in the course of preparing his assessment, he had reviewed Petitioner's police record, indictment, social history, and videotaped interview with detectives. *Id.* at 60–97, 141–56.

Dr. Natalicio opined that Petitioner did not understand the *Miranda* warnings provided before his videotaped interrogation and that he was likely mentally incompetent throughout the videotaped interview. *Id.* at 67–69. Dr. Natalicio testified that Petitioner's comprehension level was below the fifth grade level. *Id.* at 69. He added that Petitioner suffered from a language processing deficit involving the left frontal lobe of his brain, and simply could not process language. *Id.* at 89–90. Dr. Natalicio also testified that Petitioner suffered from organic brain damage, most likely the result of his

mother's excessive alcohol consumption while pregnant with Petitioner, a head injury Petitioner suffered when ejected from a moving vehicle around age four, and further brain injury resulting from the scarlet fever Petitioner contracted around age seven. *Id.* at 91. He explained that Petitioner's school records show Petitioner suffered from a developmental problem, which left him unable to learn certain things. *Id.* at 92.

During cross-examination, Dr. Natalicio testified that as part of his evaluation of Petitioner, he performed a mental status examination, administered the Wechsler Adult Intelligence Scale Revised ("WAIS-R") and a wide-range of achievement tests, and spent approximately seven and a half hours interviewing Petitioner over three different sessions. 31 Rep. R. 118–22. He added that he conducted a "political interview" of Petitioner during the mental status examination, which covered Petitioner's appearance, sensory functions, mood, and ability to use his intellect. *Id.* at 120–24. During the interviews, Dr. Natalicio also discussed Petitioner's prior conviction for manslaughter and the factual basis for that conviction. *Id.* at 126. Dr. Natalicio claimed that

Petitioner informed him that he shot someone to protect his sister from an assault. *Id.*

Thereafter, Petitioner's trial counsel filed two motions to prohibit the examination of Petitioner by the prosecution's mental health expert or, in the alternative, to limit the scope of the expert's examination of Petitioner to assessing the level of Petitioner's intellectual functioning. 2 Clerk's R. 764–71, 778–82. The state trial court subsequently granted the prosecution's motion to have Petitioner evaluated by Dr. Coons. 3 Clerk's R. 791–92.

During a pretrial *Daubert* hearing in August of 2009, the prosecution's mental health expert, Dr. Coons, testified that he was licensed both as an attorney and a physician and had previously testified on the subject of future dangerousness in capital murder trials on thirty to fifty occasions. 34 Rep. R. 13–21. He explained that, in the course of evaluating an individual for possible mental health commitment, psychiatrists routinely made predictions regarding whether the individual will engage in violence in the future—more specifically, whether the individual was homicidal or suicidal. *Id.* at

24–25.  He testified that when evaluating an individual for future

dangerousness, he examines the person's history of violence, attitude

toward violence, personality in general and the existence of any

personality disorders, criminal record and the facts surrounding the

most recent offense, and treatment of other people generally.  *Id.* at 22–

23.  He further explained that, in the course of preparing to testify at

trial, he reviewed Petitioner's offense reports for the murders of Urbina

Hernandez and Fonseca; prison and medical records from the New

Mexico Department of Corrections; school records; and Petitioner's

videotaped statement.  *Id.* at 31–33.  He also reviewed the letter,

attributed to Petitioner, soliciting the murder of two potential

prosecution witnesses and longtime friends, Torres and Carrasco.  *Id.* at

33.

Dr. Coons ultimately concluded that there was a probability that

Petitioner posed a future danger.  *Id.* at 38.

During cross-examination, Dr. Coons testified that he disagreed

with the American Psychiatric Association's position on the efficacy of

expert testimony on future dangerousness.  *Id.* at 50–52.  He also

indicated that there was a difference of opinion within the medical community regarding the efficacy of future dangerousness predictions by mental health experts. *Id.* at 54.

Petitioner's trial counsel subsequently filed a notice of Petitioner's intention not to submit to any evaluation or interview by Dr. Coons and two motions seeking to preclude imposition of the death penalty based upon assertions that Petitioner was mentally retarded and mentally immature. 3 Clerk's R. 812–15.

During a third and fourth pretrial hearing, the parties discussed extensively the admissibility of Dr. Natalicio's opinions regarding Petitioner's low intellectual level and mental retardation and the state trial court's prior ruling mandating Petitioner's submission to examination by Dr. Coons as a precondition to Dr. Natalicio testifying at trial. 36 Rep. R. 142–55. At the conclusion of both hearings, the state trial judge postponed any final ruling on the admissibility of Dr. Natalicio's trial testimony.

After these four pretrial hearings, the prosecution filed a brief arguing in favor of its second motion to allow the prosecution's mental

health expert to evaluate Petitioner and to compel the production of the factual bases for Dr. Natalicio's proposed trial testimony. 3 Clerk's R. 903–07. The state trial court subsequently issued two brief orders granting the prosecution's motions, requiring Petitioner to submit to a mental health evaluation by its expert. *Id.* at 309. Petitioner's trial counsel filed a second motion requesting that the state trial court limit the scope of Dr. Coons's examination of Petitioner to assess Petitioner's intellectual functioning level and a second notice of Petitioner's invocation of his right to refuse psychiatric examination by the prosecution's mental health expert. *Id.* at 919–22.

During the punishment phase of Petitioner's capital murder trial, the defense called Dr. Natalicio to testify outside the jury's presence in a bill of review proceeding. 72 Rep. R. 177–95. During the proceeding, Dr. Natalicio testified that he evaluated Petitioner regarding his intellectual functioning and achievement and studied "the social context of his development." *Id.* at 178. He reported that Petitioner had an estimated IQ of 62 and a mental age of nine, his verbal score on the WAIS-R was 68, his performance score was 106, and his full scale was

84. *Id.* at 182, 186. He explained that Petitioner's low scores on standardized testing were likely the product of *in utero* exposure to alcohol. *Id.* at 187–88. These scores also indicated that Petitioner suffered from frontal and prefrontal lobe damage and limited intellectual functioning. *Id.* at 191–92. He concluded that, as a result, Petitioner suffered from deficits in his ability to make judgments. *Id.* at 192–93.

At the conclusion of Dr. Natalicio's testimony, the parties re-urged their previously asserted positions, and the state trial court ruled that Dr. Natalicio would not be permitted to testify before the jury because Petitioner refused to submit to an examination by the prosecution's mental health expert. 72 Rep. R. 195–97. Accordingly, Dr. Coons did not testify during either phase of trial.

On direct appeal, Petitioner alleged that the state trial court erred when it ordered his examination by the State's mental-health expert. Appellant's Br. 37–44, AP 76,276; *Hernandez v. State*, 390 S.W.3d 310, 321 (Tex. Crim. App. 2012). Specifically, he asserted that the state trial court refused to limit the expert's examination to the scope of the

limited matters covered by his own expert.  Relying on *Estelle v. Smith,*
451 U.S. 454 (1981),[11] *Soria v. State,* 933 S.W.2d 46 (Tex. Crim. App.
1996),[12] and *Lagrone v. State,* 942 S.W.2d 602 (Tex. Crim. App. 1997),[13]
Petitioner argued that the state trial court's refusal to limit the State
expert's examination deprived him of his Fifth Amendment right
against self-incrimination and denied him the opportunity to present a
defense during the punishment phase of his trial.

The Texas Court of Criminal Appeals rejected Petitioner's point of
error, noting that "[w]hen a defendant intends to present mental-health

---

[11] In *Estelle v. Smith*, the Supreme Court explained that the
"respondent's statements . . . were not 'given freely and voluntarily
without any compelling influences'" because the respondent was faced
with a court-ordered psychiatric exam while in custody. 451 U.S. at 469.
Thus, the Supreme Court held that such statements "could be used . . .
at the penalty phase only if respondent had been apprised of his rights
and had knowingly decided to waive them."  *Id.*

[12] In *Soria*, the Texas Court of Criminal appeals held that a defendant
who presented expert testimony putting his psychological state at issue
constructively waived his Fifth Amendment right with respect to that
issue.  933 S.W.2d at 52–59.

[13] In *Lagrone*, the Court of Criminal Appeals reaffirmed *Soria* and
extended its rule to allow the state trial court to order an examination
of the defendant by the State's expert as soon as a defendant indicated
an intent to introduce such testimony from a defense expert.  942
S.W.2d at 610.

expert testimony, the State is entitled to compel the defendant to undergo examination by the State's expert for rebuttal purposes ("*Lagrone* examination")." *Hernandez*, 390 S.W.3d at 321 (citing *Lagrone,* 942 S.W.2d at 609–12)). The Texas Court of Criminal Appeals added that it would not review a trial court's *Lagrone* ruling unless the defendant first submitted to a *Lagrone* examination and suffered actual use of the results of the examination by the State. *Id.* at 321–22.

### 2.    State Habeas Review

Similarly, in his application for state habeas corpus relief, Petitioner once again argued that the state trial court erred in refusing to permit the defense to call Dr. Natalicio to testify regarding Petitioner's low intellectual functioning without requiring Petitioner to submit to an examination by Dr. Coons. 1 State Habeas R. 13, 50–60.

After the evidentiary hearing held in Petitioner's state habeas corpus proceeding, the state habeas trial court concluded that Dr. Natalicio's interviews and examination of Petitioner allowed him to form opinions which were relevant not only to the issue of Petitioner's intellectual level, but also to the mitigation and future dangerousness

special issues.  2 State Habeas R. 577.  The state habeas trial court

further determined that Petitioner's trial counsel made a strategic

decision to forego Dr. Natalicio's testimony based upon a full

understanding of the facts and law and for the purpose of precluding

possibly harmful testimony by the State.  2 State Habeas R. 578.

Consequently, the state habeas trial court concluded that

Dr. Natalicio's examination of Petitioner was relevant to the issues of

future dangerousness and mitigation, the admissibility of

Dr. Natalicio's testimony was addressed on direct appeal, and Petitioner

could not re-litigate the issue during his state habeas corpus

proceeding.  *Id.* at 581–82.  The Texas Court of Criminal Appeals

adopted these findings and conclusions when it denied Petitioner's state

habeas corpus application.  *Ex parte Fabian Hernandez*, 2015 WL

376357, at *1.

### 3.   Clearly Established Federal Law

In *Estelle v. Smith*, 451 U.S. 454 (1981), the State's psychiatrist

examined, without the benefit of *Miranda* warnings, a Texas defendant

charged with capital murder to determine defendant's competence to

stand trial. At the punishment phase of the trial, the prosecution called the State's psychiatrist to testify in rebuttal to the defendant's three lay witnesses. 451 U.S. at 458–59. The psychiatrist predicted that the defendant would pose a risk of future dangerousness. *Id.* at 460.

The *Estelle* court held that the use of the psychiatrist's testimony violated the defendant's Fifth Amendment right against self-incrimination because the defendant was not warned prior to his pretrial examination that his statements could be used against him at trial. *Id.* at 466–68. The Supreme Court reasoned that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.* at 468. The Supreme Court also held the defendant's Sixth Amendment right to counsel was violated by the admission of the State's psychiatrist's testimony following an unwarned examination. *Id.* at 471.

The Supreme Court did distinguish, however, the facts in *Estelle v. Smith* from situations in which a defendant intends to introduce

psychiatric evidence at the penalty phase, emphasizing its opinion in

*Jurek v. Texas*, 428 U.S. 262 (1976). *See id.* at 472–73. In that case, the

Supreme Court expressly recognized the predictive nature of the Texas

capital sentencing scheme's future dangerousness special issue and the

propriety of psychiatric testimony. *Jurek*, at 472–73.

In *Buchanan v. Kentucky*, 483 U.S. 402, 408–411 (1987), the

prosecution used psychiatric evidence to rebut an "extreme emotional

disturbance" defense raised through a social worker who read several

reports relating to defendant's mental condition to the jury. During

cross-examination, the prosecution asked the social worker to read

other reports on the defendant's progress after his pretrial

institutionalization, including a report on a pretrial psychological

evaluation conducted pursuant to the parties' joint motion. 483 U.S. at

410–11. The defense objected, arguing that the latter report was the

product of an unwarned examination similar to the one in *Estelle v.*

*Smith*. *Id.* at 411–12.

The *Buchanan* court rejected the argument, holding that the use

of the psychological evaluation did not violate the defendant's Fifth

Amendment right against self-incrimination. *Id.* at 423–24. It explained that where a defendant requested a psychiatric examination in order to prove a mental-status defense, he waived the right to raise a Fifth Amendment challenge to the prosecution's use of the evidence obtained through that examination to rebut the defense. *Id.* at 423. The *Buchanan* court also rejected the defendant's analogous Sixth Amendment claim. *Id.* at 424.

More recently, in *Kansas v. Cheever*, 134 S. Ct. 596 (2013), the Supreme Court confronted yet another similar situation. In *Cheever*, a capital murder defendant notified a federal court that he intended to introduce expert evidence suggesting that his voluntary methamphetamine intoxication rendered him incapable of forming the specific intent necessary for his offense. 134 S. Ct. at 599. The district court ordered the defendant to submit to a psychiatric evaluation to assess how the methamphetamine had affected him at the time of his offense. *Id.*

After the federal case was dismissed without prejudice, Kansas state officials re-instituted a capital murder case against the defendant.

*Id.* The defendant asserted a voluntary intoxication defense, again arguing that his methamphetamine use rendered him incapable of premeditation. *Id.* The defense presented the testimony of an expert in psychiatric pharmacy, who testified that the defendant's long-term methamphetamine abuse had damaged his brain, and, on the morning of the fatal shooting, the defendant was acutely intoxicated. *Id.* The prosecution then sought to present rebuttal testimony from the forensic psychiatrist who had evaluated the defendant during the federal prosecution. *Id.* at 600. The defense objected, arguing that the defendant's Fifth Amendment rights would be violated by the admission of the testimony because the defendant had not agreed to his federal-court-ordered evaluation. *Id.* The state trial court allowed the testimony. *Id.* On appeal, the Kansas Supreme Court reversed the state trial court's ruling. *Id.* The United States Supreme Court upheld the state trial court's ruling and reversed the Kansas Supreme Court, underscoring the principle of parity: "Any other rule would undermine the adversarial process, allowing a defendant to provide the jury,

through an expert operating as a proxy, with a one-sided and potentially inaccurate view of his mental state." *Id.* at 601

    4.   <u>Analysis</u>

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's grounds for relief was fully consistent with the principles discussed by the Supreme Court in *Buchanan* and *Cheever*. The Fifth Circuit has likewise recognized the fundamental fairness of permitting the prosecution to evaluate a criminal defendant when the defendant advises that he will present expert mental health testimony premised, in part, upon a clinical evaluation. *See Schneider v. Lynaugh*, 835 F.2d 570, 576 (5th Cir. 1988) ("It is unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resorting to the most effective and in most instances the only means of rebuttal: other psychological testimony. The principle also rests on 'the need to prevent fraudulent mental defenses.'" (footnotes omitted)).

Petitioner essentially wanted the state court to apply a new rule of constitutional criminal procedure, which is precluded by the Supreme

Court's non-retroactivity doctrine announced in *Teague v. Lane,* 489 U.S. 288 (1989). At the time that Petitioner's conviction became final for *Teague* purposes, neither the Supreme Court nor any federal circuit court had held that that the Fifth or Eighth Amendment allowed a criminal defendant to introduce expert mental health testimony during the punishment phase of a capital murder trial, premised in part upon a clinical interview of the defendant, without submitting to a clinical interview by the prosecution's mental health expert.

Insofar as Petitioner argues that the state trial court improperly applied the state evidentiary rules announced in *Lagrone*, 942 S.W.2d at 602 and *Soria*, 933 S.W.2d at 46, in ruling on the admissibility of Dr. Natalicio's testimony, those arguments do not furnish a basis for federal habeas corpus relief.

It is well-settled law in the Fifth Circuit that, in reviewing state evidentiary rulings in habeas corpus petitions, a federal court does not sit as super state supreme court to review error under state law. *Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988). It is not the province of a federal habeas court to reexamine state court determinations on state-

law questions, such as the admissibility of evidence under state procedural rules. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Goodrum v. Quarterman*, 547 F.3d 249, 261 (5th Cir. 2008). A federal court may grant habeas relief based on an erroneous state court evidentiary ruling only if the ruling also violates a specific federal constitutional right or renders the petitioner's trial fundamentally unfair. *Brown v. Epps*, 686 F.3d 281, 286 n.20 (5th Cir. 2012); *Goodrum*, 547 F.3d at 261; *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999); *Pemberton v. Collins*, 991 F.2d 1218, 1226 (5th Cir. 1993). The challenged evidence must also be a crucial, critical, or highly significant factor in the context of the entire case. *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011); *Jackson v. Johnson,* 194 F.3d 641, 656 (5th Cir. 1999).

The test to determine whether a trial error renders a trial "fundamentally unfair" is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted. *Brown v. Dretke*, 419 F.3d 365, 377 (5th Cir. 2005); *Guidroz v. Lynaugh*, 852 F.2d 832, 835 (5th Cir. 1988). Due process is

implicated only for rulings of such a magnitude or so egregious that they render the trial fundamentally unfair; it offers no authority to federal habeas courts to review common evidentiary rulings of state trial courts. *Gonzales*, 643 F.3d at 430. A "fundamentally unfair" trial is one largely robbed of dignity due a rational process. *Menzies v. Procunier*, 743 F.2d 281, 288 (5th Cir. 1984). Petitioner has failed to make such a showing here.

To the extent Petitioner argues that the exclusion of Dr. Natalicio's testimony prevented the defense from presenting evidence of Petitioner's low intellectual functioning, that argument is factually inaccurate. As explained above, Dr. Cunningham testified extensively that he believed Petitioner's history, school records, and standardized test results showed that, as a result of alcohol and inhalant abuse and a host of other developmental disadvantages, Petitioner functioned in the lower range of intellectual functioning and was intellectually deficient. 74 Rep. R. 113–15, 122, 136, 160–62, 168–70, 367. Furthermore, the pretrial IQ testing conducted for Petitioner's defense team showed that Petitioner's full scale IQ test scores were in

the mid-to-upper eighties—well above the range of mental retardation or even borderline mental retardation. Under such circumstances, the exclusion of Dr. Natalicio's testimony about Petitioner's low intellectual functioning did not render Petitioner's entire trial fundamentally unfair.

Petitioner also asserts that Dr. Natalicio did little more than merely administer standardized intelligence and academic achievement tests and, therefore, the state trial court should have permitted his testimony or should have limited any subsequent evaluation by Dr. Coons to similar standardized testing. Am. Pet. 60–63. However, these arguments are based upon a factually inaccurate premise. To be sure, Dr. Natalicio testified at both the pretrial hearing on Petitioner's motion to suppress, as well as during his bill of review testimony, that he did far more than simply administer standardized tests. Dr. Natalicio conducted a mental status examination of Petitioner and also conducted an extensive clinical interview of Petitioner, discussing, *inter alia*, the details of Petitioner's prior manslaughter offense and the reasons that Petitioner chose to enter a guilty plea to that charge.

31 Rep. R. 118–35; 72 Rep. R. 178–95. Dr. Natalicio candidly admitted that his mental status examination and "political interview" of Petitioner extended to a wide range of subjects, including Petitioner's background and the details of Petitioner's prior criminal history. 31 Rep. R. 120–24. The state trial court reasonably concluded that the type of expert mental health testimony that Dr. Natalicio might have furnished at trial warranted Petitioner's submission to a similar clinical interview by a prosecution mental health expert.

Consequently, the Texas Court of Criminal Appeals' rejection on the merits of Petitioner's claims regarding the state trial court's pretrial *Lagrone* rulings was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. Moreover, the decision was not based upon an unreasonable determination of the facts in light of the evidence presented in Petitioner's trial, direct appeal, and state habeas corpus proceedings. Hence, the Court concludes that Petitioner's third and fourth grounds for relief in his Amended Petition do not warrant federal habeas corpus relief.

**B.     Grounds 5 and 6 - The State Trial Court Erred in Refusing to Allow Certain Mitigation Questions During Voir Dire.**

In his fifth and sixth grounds for relief, Petitioner argues that the state trial court erred by preventing his trial counsel from asking the jury venire whether they would consider specific kinds of mitigating evidence in answering the mitigation special issue.  Am. Pet. 67–76.  He argues that the state trial court's decision interfered with his ability to make valid challenges for cause and, consequently, with his ability to utilize his peremptory strikes.

1.     <u>State Court Disposition</u>

At a status conference prior to trial in July of 2008, the parties discussed with the state trial court the need for an extensive juror questionnaire.  14 Rep. R. 7–9.  At a subsequent status conference held in March 2009, the prosecution expressed concern that the questionnaire had become too lengthy for most jurors to complete in a reasonable amount of time, but the parties pledged to continue efforts to finalize the document.  22 Rep. R. 4–12.  At yet another status conference held in July of 2009, the parties announced that they had

reached an agreement on a questionnaire, which approached forty pages in length. 32 Rep. R. 4–5. The juror questionnaire included, *inter alia*, a series of questions asking the venire members to express agreement or disagreement, with a range of answers from "strongly agree" to "strongly disagree," with a series of statements about whether a person was "less responsible" for their actions if they had suffered from a variety of problems, such as child abuse, "emotional problems," "psychiatric problems," mental handicaps, and a disadvantaged background. *E.g.*, 42 Rep. R. 87–89; 43 Rep. R. 37–41.

On the third day of individual voir dire, Petitioner's trial counsel asked a prospective juror the following question:

> So if you do not agree that a person who has been abused as a child is less responsible for his or her actions, okay, you cannot take that, if you hear it, . . . you cannot take that into consideration to determine whether it reduces the person's moral culpability, right?

42 Rep. R. 93. The prosecution objected to the question as "contracting," or asking the venire member to "say what she would do with or without that specific type of evidence in answering that

question." 42 Rep. R. 93–94. Ultimately, the state trial court sustained the objection, but clarified that defense counsel could continue to inquire about the jurors' views on the potentially mitigating factors; he simply could not ask the question phrased in the aforementioned manner. *Id.* at 98.

The following day, Petitioner's trial counsel advised the state trial court that he intended to ask each venire member regarding whether they would refuse to consider evidence of the following in determining whether a sentence of life imprisonment without parole, rather than the death penalty, would be warranted: turbulent family history, emotional problems, upbringing, character, mental impairment, child abuse, psychiatric problems, dysfunctional family history, and alcohol abuse. 43 Rep. R. 133–34.

The prosecution objected to the structure of the questions as the equivalent of asking the venire members whether they considered specific types of potentially mitigating evidence "to be mitigating or not," and argued that the jurors were not required to commit to consider specific types of evidence as "mitigating." *Id.* at 134–37. Petitioner's

trial counsel argued that he was only seeking to learn whether the venire members could consider certain types of mitigating evidence within the context of the Texas capital sentencing scheme's mitigation special issue. *Id.* at 139–43. Ultimately, the state trial judge sustained the prosecution's objection, concluding that the proposed questions were an effort to "commit the prospective juror to resolve or to refrain from resolving an issue a certain way after learning a particular fact." *Id.* at 137.

In his first two points of error on direct appeal, Petitioner maintained that the state trial court erred when it refused to permit his trial counsel to ask questions of venire members during individual voir dire regarding their views on specific types of potentially mitigating evidence. Appellant's Br. 10–22, AP 76,275; *Hernandez*, 390 S.W.3d at 314. Petitioner argued that the state trial court's restrictions on his counsel's voir dire examination of the jury venire prevented the defense from challenging for cause venire members who were biased and precluded his intelligent use of peremptory challenges.

The Texas Court of Criminal Appeals rejected these arguments on the merits:

> We review a trial court's ruling regarding the limitation of voir dire questioning for an abuse of discretion. *Barajas v. State*, 93 S.W.3d 36, 38 (Tex. Crim. App. 2002). In this review, our focus is whether appellant proffered a proper question regarding a proper area of inquiry. *Id.* A trial court retains discretion to restrict voir dire questions that are confusing, misleading, vague and broad, or are improper commitment questions. *Id.* at 38–39. Where the trial court does not place an absolute limitation on the substance of an appellant's voir dire question, but merely limits a question due to its form, the appellant must attempt to rephrase the question or risk waiver of the alleged voir dire restriction. *Howard v. State*, 941 S.W.2d 102, 108–11 (Tex. Crim. App.1996).

> A commitment question is one that commits a prospective juror to resolve, or refrain from resolving, an issue a certain way after learning a particular fact. *See Standefer v. State,* 59 S.W.3d 177, 179 (Tex. Crim. App. 2001). Often a commitment question requires a "yes" or "no" answer, and the answer commits a juror to resolve an issue in a particular way. *Id.* Not all such questions are improper, however. *Id.* at 181. Where the law requires a certain type of commitment from jurors, such as considering the full range of punishment, an attorney may ask prospective jurors to commit to following the law in that regard. *Id.*

The law does not require that a juror consider any particular piece of evidence to be mitigating. *Raby v. State,* 970 S.W.2d 1, 3 (Tex. Crim. App. 1998). The law requires only that defendants be allowed to present relevant, mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating. *Id.* Whether a juror considers a particular type of evidence to be mitigating is not a proper area of inquiry. *Standefer,* 59 S.W.3d at 181.

The question at issue here was an improper commitment question; it sought a "yes" or "no" answer and committed the prospective juror to a determination of whether the stated circumstance was mitigating, *i.e.* being abused as a child. Further, the record reflects that the trial court did not place an absolute limitation on the underlying substance of the excluded question. Appellant was allowed to ask prospective jurors to expound on their questionnaire answers and was therefore able to delve into that substance. Rather, the trial court merely sustained the State's objection to the form of the question. *See Howard*, 941 S.W.2d at 108–12 (finding that where appellant was allowed to question jurors regarding the substance of the restricted questions, albeit in a different form, there was no abuse of discretion). We do not find an abuse of discretion.

*Hernandez v. State*, 390 S.W.3d at 314–16.

## 2. Clearly Established Federal Law

The Supreme Court held in *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991), that trial judges exercise great latitude in determining what questions should be asked during voir dire.  Trial judges, exercising their sound discretion, supervise the inquiry into whether a potential juror has any bias, opinion, or prejudice which could affect a juror on the issues to be tried.  *Id.* at 422.  To be constitutionally compelled, it is not enough that a proposed question might be helpful in ferreting out potential disqualifying bias; rather, the state trial court's failure to ask or permit the question must render the defendant's trial fundamentally unfair.  *Id.* at 425.

While a defendant must be afforded an opportunity to present mitigating evidence at the punishment phase of a capital trial, the fact that a juror might view evidence presented by the defense as aggravating, as opposed to mitigating, does not implicate an Eighth Amendment violation.  *See Johnson v. Texas*, 509 U.S. 350, 368 (1993) ("As long as the mitigating evidence is within 'the effective reach of the sentencer,' the requirements of the Eighth Amendment are satisfied.").

Furthermore, a defendant does not have a constitutional right to peremptory challenges: "[The Supreme] Court repeatedly has stated that the right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial." *Georgia v. McCollum*, 505 U.S. 42, 57 (1992).

3.   Analysis

Petitioner argues that the state trial court's limitations on his efforts to voir dire the jury venire prevented his trial counsel from intelligently asserting challenges for cause against potentially biased jurors and exercising the defense's peremptory challenges.

The Fifth Circuit has expressly rejected both of Petitioner's contentions: "[T]he law is clear that a defendant in a capital case is not entitled to challenge prospective jurors for cause simply because they might view the evidence the defendant offers in mitigation of a death sentence as an aggravating rather than a mitigating factor." *Dorsey v. Quarterman*, 494 F.3d 527, 533 (5th Cir. 2007).  Thus, Petitioner's claim that he was deprived of the ability to discover information that might have furnished the basis for a challenge for cause is without merit.

Similar to the petitioner in *Dorsey*, Petitioner identifies no member of his actual petit jury whom he claims was biased or otherwise unqualified to serve as a juror in Petitioner's capital murder trial. "[E]ven if the court erred in denying his challenges for cause, there was no constitutional violation because the jurors were removed from the jury by his use of peremptory challenges and he has not alleged that the jury that sat in his capital murder trial was not impartial." *Id.*

In *Soria v. Johnson*, 207 F.3d 232 (5th Cir. 2000), the Fifth Circuit confronted a similar challenge to a Texas trial court's refusal to permit voir dire questions that attempted to bind prospective jurors regarding their position on the evidence. The Fifth Circuit found no constitutional error in the state trial court's ruling, given the extent of other voir dire questioning into potentially mitigating evidence that the trial judge did allow. *Soria*, 207 F.3d at 244. The Fifth Circuit noted that while "the trial judge did not allow the particular phrasing [the petitioner] sought," "the form of questioning permitted by the state trial court was sufficient to allow an intelligent exercise of his peremptory challenges." *Id.* Ultimately, the *Soria* court found that "the voir dire questioning

was sufficient to allow the petitioner to determine whether a prospective juror would consider the evidence proffered in mitigation by the defense" and that he was "entitled to no more" than this. *Id.* Consequently, he "failed to make a substantial showing of the denial of a federal right." *Id.*

In the case at bar, the Court reaches the same conclusion. As explained above, the state trial court permitted the use of a lengthy questionnaire, which included a number of questions inquiring into whether the venire members viewed specific types of potentially mitigating evidence as diminishing the defendant's moral culpability. *See, e.g.*, 42 Rep. R. 87–89; 43 Rep. R. 37–41.

During individual voir dire, Petitioner's trial counsel were permitted to further question venire members regarding their answers to those very questions. While the state trial court refused to permit Petitioner's trial counsel to commit the venire members to whether they could consider the mitigating aspects of much of the double-edged evidence, the Court's independent review of the entirety of defense counsel's voir dire examination convinces the Court that it was

sufficient to permit Petitioner's trial counsel to determine whether a prospective juror would consider the mitigation evidence they proffered. Petitioner was entitled to nothing more. *See Soria*, 207 F.3d at 244.

In light of the extensive juror questionnaire utilized during jury selection, which included numerous questions asking whether venire members believed particular types of evidence made a person "less responsible" for their criminal behavior, the relatively minor restrictions that the state trial court imposed on the scope of Petitioner's trial attorneys' individual voir dire of the jury venire did not render Petitioner's trial fundamentally unfair.

Finally, insofar as Petitioner argues that his trial attorneys were prevented from making fully informed use of peremptory challenges, Petitioner's argument does not invoke a federal constitutional right. *See McCollum*, 505 U.S. at 57 (holding peremptory challenges are not constitutionally protected rights but, rather, one means to achieve a constitutionally required impartial jury and a prohibition on the use of peremptory challenges does not impair the constitutional guarantee or an impartial jury and fair trial).

Consequently, the Texas Court of Criminal Appeals' rejection of the aforementioned arguments on the merits during the course of Petitioner's direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. It also was not based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's trial and direct appeal. The Court concludes that Petitioner's fifth and sixth claims in his Amended Petition are foreclosed by the Fifth Circuit's holdings in *Dorsey* and *Soria* and do not warrant federal habeas corpus relief.

**C.     Ground 1 – Trial Counsel Provided Ineffective Assistance During the Punishment Phase of Trial.**

In his first ground for relief, petitioner maintains that his death sentence violates the Sixth and Fourteenth Amendments of the United States Constitution because he was deprived of the effective assistance of counsel at the punishment phase of his trial in that his attorneys failed to:

> a.     object on the ground that his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution were violated

when he was not allowed to introduce before the jury evidence of his scores on standardized intelligence tests unless he first waived his constitutional privilege not to be a witness against himself and submitted to a comprehensive examination by Dr. Coons, a psychiatrist from whom the prosecution intended to elicit testimony on the question of Petitioner's future dangerousness;

b.  permit an examination of Petitioner by the state's psychiatrist on the condition that the psychiatrist not express any opinion on the question of future dangerousness absent an expression of opinion on that issue by [Dr. Natalicio];

c.  object to the prosecuting attorney's erroneous argument to the jury that the word "probability" in the future dangerousness special punishment issue means "more than a mere possibility";

d.  object to the trial court's omission from the jury charge of an instruction requiring proof beyond reasonable doubt that no mitigating circumstances existed to warrant a sentence of life imprisonment rather than death; and

e.  adequately investigate Petitioner's mental health, in particular evidence suggesting that he suffers from organic brain damage, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Am. Pet. 35–41.  Petitioner also argues that the cumulative effect of all of the foregoing instances of ineffective assistance by his trial counsel prejudiced him.  *Id.* at 41–43.

1. <u>Grounds 1a and 1b – Trial Counsel Provided Ineffective Assistance When They Elected to Forego IQ Evidence to Avoid Dr. Coons's Evaluation of Petitioner.</u>

In his first and second assertions of ineffective assistance by his trial counsel, Petitioner argues that trial counsel failed to raise federal constitutional challenges to the state trial court's pretrial rulings refusing to permit the admission of Dr. Natalicio's testimony on Petitioner's low intellectual functioning unless Petitioner first submitted to a clinical interview by Dr. Coons.  Am. Pet. 19–23.  Petitioner also claims that his trial counsel failed to permit him to submit to a clinical interview by Dr. Coons, which would have allowed Dr. Natalicio to testify at trial.

*a.    State Court Disposition*

Petitioner presented the same ineffective-assistance-of-counsel claims in his state writ application.  1 State Habeas R. 13, 50–67.  After extensive testimony from Petitioner's trial counsel during an

evidentiary hearing, the state trial court recommended that the Texas Court of Criminal Appeals deny him habeas relief, finding that his trial counsel made each of the objections that Petitioner claimed they had failed to make. 2 Clerk's R. 582 (¶ 20). The state trial court further found that Petitioner failed to demonstrate that his proposed objections were well founded in law. *Id.* at ¶ 21. Accordingly, in considering Petitioner's state habeas application, the state trial court concluded that Petitioner failed to demonstrate that trial counsel's performance was deficient under the first prong of *Strickland*. *Id.* at 583 (¶ 22). The Texas Court of Criminal Appeals expressly adopted these findings and conclusions when it rejected Petitioner's state habeas corpus application on the merits. *Ex parte Hernandez*, 2015 WL 376357, at *1.

### b. *Clearly Established Federal Law*

Since the state court adjudicated this issue on the merits, § 2254(d)(1) applies. *See Cullen*, 563 U.S. at 181. To succeed on his claim, Petitioner must demonstrate that the state court's application of *Strickland*'s prejudice prong was unreasonable. In other words, Petitioner must show that the state court's determination is "so lacking

in justification" that it is "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103; *see also Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state–court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

### c.    Analysis

Petitioner has failed to present the Court with any evidence demonstrating that the state habeas trial court's factual findings and its rejection on the merits of Petitioner's ineffective-assistance claims were in any manner objectively unreasonable. *See Williams*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual findings in question or the implicit credibility determination underlying the factual findings, this does not furnish a sufficient basis for the federal habeas court to supersede the state trial court's factual determinations. *See Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341–42 (2006).

Trial counsel argued to the state trial court that presenting

Dr. Natalicio's examination did not waive his Fifth Amendment right and that extending *Soria* and *Lagrone* to such examinations violated the Fifth Amendment. *See* 30 Rep. R. 27–28 ("It is crucial for the trial court to protect the defendant's Fifth Amendment right. That's the *Lagrone* court advising trial courts . . . . So since he hasn't waived those rights, and until he puts his expert on, whatever you do pretrial has to be strict and close and protect[ive] of his Fifth Amendment right."); *id.* at 30 ("In other words, *Lagrone* says that the [c]ourt is there to protect the Fifth Amendment rights of the defendant. And in that regard, there are procedural things that the trial courts do and one of them is to limit the parameters of the State's expert's examination to those exercised by [d]efense experts."); 2 Clerk's R. 765 ("[Petitioner's] mental health expert has not conducted an examination or interrogation that consists of [an] invasion of the [Petitioner's] Fifth Amendment rights . . . . [Petitioner] has not waived his Fifth Amendment rights with respect to his interviews with his mental health expert."). Trial counsel also argued that extending *Lagrone* to the types of IQ tests performed by Dr. Natalicio violated the Eighth Amendment. 53 Rep. R. 45–50, 58–61.

During his pretrial testimony, Dr. Coons asserted that, based upon the documentary evidence he had reviewed, he had formed a preliminary opinion that Petitioner posed a risk of future dangerousness even if sentenced to life without parole.  34 Rep. R. 21–25, 30–33, 38.  Petitioner's trial counsel filed multiple motions seeking to preclude or limit any examination of Petitioner by Dr. Coons, argued in support of those motions at multiple pretrial hearings, opposed the prosecution's motions seeking to have Petitioner evaluated by Dr. Coons, and did everything necessary to preserve for state appellate review all of the federal constitutional claims urged during Petitioner's state habeas corpus proceeding.  1 State Habeas R. 401–90.

Petitioner's lead trial counsel testified during Petitioner's state habeas proceeding that the defense was fully aware of the consequences of having Dr. Natalicio conduct a clinical interview of Petitioner under the *Lagrone*/*Soria* line of cases and instructed Dr. Natalicio not to conduct a general clinical interview or explore Petitioner's criminal background or life history.  1 Clerk's R. 408–11.  Moreover, after hearing Dr. Coons's testimony at the pretrial hearing, the defense was

adamantly opposed to permitting Dr. Coons to testify on the subject of future dangerousness at Petitioner's trial. Finally, once the state trial court ruled that Dr. Coons could examine Petitioner, the defense made an intentional decision to invoke Petitioner's Fifth Amendment right and refuse to permit Petitioner's interview by Dr. Coons. 1 State Habeas R. 401–39.

Petitioner failed to present the state habeas trial court with evidence suggesting that his trial counsel's strategic decision to forego Dr. Natalicio's testimony at trial was objectively unreasonable in light of the state trial court's pretrial rulings. Dr. Natalicio's clinical interview of Petitioner went considerably beyond the scope of the examination Petitioner's trial counsel believed they had requested. Thus, pursuant to *Estelle* and *Buchanan*, that interview necessarily opened the door to a clinical interview and possible rebuttal testimony by a prosecution expert if the defense chose to introduce Dr. Natalicio's testimony at trial. Furthermore, for the reasons explained above, Petitioner's federal constitutional objections to the state trial court's pretrial *Lagrone/Soria* rulings lacked legal merit. The Court finds

nothing objectively unreasonable regarding the state habeas trial court's determination that Petitioner's trial counsel was not deficient in making a strategic decision to prevent Dr. Coons from testifying during the punishment phase of Petitioner's capital murder trial.

Additionally, the state habeas trial court's factual findings and legal conclusions regarding the conduct of Petitioner's trial counsel in challenging the state trial court's pretrial *Lagrone/Soria* rulings were reasonable in view of the state pretrial, trial, and habeas records.

Because the state habeas trial court did not specifically address the prejudice prong of the *Strickland* analysis when it rejected Petitioner's analogous ineffective-assistance claim, the Court will conduct an independent analysis of the prejudice prong *de novo*. *See Porter*, 558 U.S. at 39 (holding that *de novo* review of the allegedly deficient performance of the petitioner's trial counsel was necessary because the state court had failed to address this prong of the *Strickland* analysis); *Rompilla*, 545 U.S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* is required where the state courts rested their rejection of an ineffective-assistance claim on the deficient-

performance prong and never addressed the issue of prejudice);
*Wiggins*, 539 U.S. at 534 (holding the same).

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U.S. 15, 20 (2009); *Wiggins*, 539 U.S. at 534. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong*, 558 U.S. at 27. Within the context of the *Strickland* analysis, "prejudice" means a reasonable probability that the result of the proceeding would have been different but for counsel's errors. *Hinton v. Alabama,* 134 S. Ct. 1081, 1089 (2014); *Ayestas v. Stephens*, 817 F.3d 888, 898 (5th Cir. 2016).

Having conducted a *de novo* review of the entirety of the state court record from Petitioner's trial, direct appeal, and state habeas proceeding, the Court independently concludes that Petitioner was not

"prejudiced" within the meaning of *Strickland* by his trial counsel's conduct vis-à-vis the state trial court's pretrial *Lagrone/Soria* rulings. For the reasons discussed at length above, the Court concludes that Petitioner's federal constitutional challenges to the state trial court's pretrial *Lagrone/Soria* rulings lacked legal merit. *See Segundo v. Davis*, 831 F.3d 345, 350–51 (5th Cir. 2016) ("[H]abeas counsel was not ineffective in failing to raise a meritless claim."); *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.").

Moreover, Petitioner was not prejudiced by his trial counsel's alleged deficient performance because, regardless of the evidence that Petitioner did present or could have presented via Dr. Natalicio, the prosecution presented strong, robust evidence in favor of an affirmative answer to the future dangerousness special issue and a negative answer to the mitigation special issue.

The prosecution's evidence during Petitioner's trial focused on furnishing victim impact testimony and establishing Petitioner's connection to a letter intercepted within the El Paso County Jail soliciting the murders of two prosecution witnesses. During closing argument, the prosecution asserted that Petitioner had not reformed his behavior following his New Mexico manslaughter conviction and prison sentence; Petitioner's murder of Fonseca–someone Petitioner hardly knew–showed a lack of morality; there was an absence of evidence that Petitioner's double murder of his wife and Fonseca was a crime of passion; the evidence establishing that Petitioner plotted the murders of two prosecution witnesses demonstrated that Petitioner had not learned from his prior criminal behavior; Petitioner's gang membership strongly supported a finding that Petitioner would remain a continuing threat to society; and the jury should answer the future dangerousness special issue affirmatively and the mitigation special issue negatively. 75 Rep. R. 67–87.

After the defense made its closing argument during the punishment phase of the trial, the prosecution argued that the letter

soliciting the murders of two prosecution witnesses, linked to Petitioner via forensic evidence and his gang nickname, proved that Petitioner was, and would remain, a continuing threat to society; the evidence of Petitioner's membership in the Barrio Azteca gang also supported a finding of future dangerousness; other letters Petitioner wrote to his family while awaiting trial contained thinly veiled threats against other individuals; Petitioner's threatening letters were a better indication of his personality than the glowing testimony of his family and friends; and Petitioner was a thirty-one-year-old adult, not an adolescent, when he murdered his wife and Fonseca. 75 Rep. R. 132–60.

Accordingly, the Court independently concludes, after *de novo* review, that there is no reasonable probability that the outcome of the punishment phase of Petitioner's capital murder trial would have been any different had Petitioner's trial counsel either called Dr. Natalicio to testify about Petitioner's low intellectual functioning or permitted Petitioner to be interviewed by Dr. Coons, both of which Petitioner now argues should have occurred. Dr. Natalicio's opinion regarding Petitioner's low intellectual functioning likely would have been

undermined on cross-examination by the fact that Petitioner scored well above the range of mental retardation, and even borderline mental retardation, on the standardized IQ test instrument. Furthermore, such testimony would have been largely repetitive of Dr. Cunningham's testimony concerning Petitioner's low intellectual functioning. Petitioner's jury was well aware, through Dr. Cunningham's testimony, of the defense's contention that Petitioner suffers from significant intellectual deficits. Finally, opening the door to the potentially devastating testimony of Dr. Coons on the subject of future dangerousness similar to his testimony during the pretrial hearing would likely have still resulted in an affirmative answer to the future dangerousness special issue.

By the time the punishment phase of Petitioner's trial commenced, the jury had already convicted Petitioner, having found beyond a reasonable doubt that Petitioner fatally shot two individuals at close range. By the time the punishment phase of Petitioner's capital murder trial concluded, there was no evidence that Petitioner had ever expressed genuine remorse or sincere contrition for his capital offense.

By the conclusion of the punishment phase of Petitioner's capital murder trial, there was evidence before the jury demonstrating that Petitioner had been a member of a street gang as an adolescent, had fatally shot another adolescent, and was, at the time of the offense, an active member in a notorious gang.

Most significantly, Petitioner plotted the murders of two of his acquaintances and enlisted the assistance of his fellow gang members in the plot at a time when it would rationally be expected that, as a criminal defendant, he would not comport himself in this manner. Even considering all of the mitigating aspects of the testimony furnished by Petitioner's friends, relatives, and Dr. Cunningham, the Court concludes there is no reasonable probability that the outcome of the punishment phase of Petitioner's capital murder trial would have been different if Petitioner's trial counsel had chosen to permit Petitioner's examination by Dr. Coons and then called Dr. Natalicio to testify. The questionable additional mitigating value of Dr. Natalicio's testimony regarding Petitioner's low intellectual level would likely have been dwarfed by Dr. Coon's assessment of Petitioner's future

dangerousness—an analysis that would have perhaps been more comprehensible to the jury, and less counter-intuitive, than Dr. Cunningham's suggestion that Petitioner, a violent criminal, would not be a violent prisoner.

### d.    Conclusion

The Texas Court of Criminal Appeals' rejection of Petitioner's ineffective-assistance claims was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court.  It also did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas corpus proceeding. The state habeas trial court reasonably concluded that these ineffective-assistance claims both failed to satisfy the deficient-performance prong of the *Strickland* analysis.  Furthermore, the Court independently concludes, after *de novo* review, that both of these claims fail to satisfy the prejudice prong of *Strickland* analysis.  Hence, Petitioner's first and second assertions of ineffective assistance by trial counsel do not warrant federal habeas corpus relief.

2. Ground 1c – Trial Counsel Provided Ineffective
   Assistance by Failing to Object to the Prosecution's
   Definition of "Probability" as "More than a Mere
   Possibility."

In his third ineffective-assistance claim, Petitioner argues that his trial counsel failed to timely object when the prosecution suggested during voir dire and closing argument of the punishment phase that the term "probability," as used in the Texas future dangerousness capital sentencing special issue, meant "more than a mere possibility."  Am. Pet. 23–30.

a. *State Court Disposition*

Trial counsel filed several pretrial motions requesting that the state trial court hold Texas's death–penalty statutes unconstitutional "for failure to define terms," including "probability."  1 Clerk's R. 119–21; 2 Clerk's R. 478–85, 668–71, 720–27; 36 Rep. R. 42–46, 86–98.  The state trial court denied the motions.  36 Rep. R. 46, 98.  During individual voir dire, the prosecution expressly instructed the first nine jurors that "probability" meant "more likely than not." 40 Rep. R. 107–08; 42 Rep. R. 124; 45 Rep. R. 62–63; 46 Rep. R. 19–21; 47 Rep. R. 31; 52 Rep. R. 127; 56 Rep. R. 153–54; 57 Rep. R. 187–88.  In some cases,

defense counsel reaffirmed the "more likely than not" definition.  40 Rep. R. 117; 42 Rep. R. 161–62.  After the ninth juror's voir dire, a dispute arose between the parties as to the proper inquiry into prospective jurors' definitions of the term.  57 Rep. R. 216–33.  The state trial court subsequently allowed defense counsel to instruct one of the jurors that probability meant that the defendant would "probably" commit violent acts in the future.  57 Rep. R. 295–96.  The state trial court's jury charge did not define probability.  75 Rep. R. 59–67. Accordingly, with neither a statutory nor a court-issued definition, the parties constructed their arguments utilizing their preferred definitions.  During argument at the punishment phase of trial, the prosecution, without objection, argued that "probability" in the context of the future dangerousness special issue meant "more than a mere possibility."  75 Rep. R. 68.  Rather than objecting, defense counsel addressed the State's proposed definition of probability head on:

> Now let's look at the word "probability."  We don't know what that means.  As you look in your charge, there is no single definition.  And if you remember the first charge of guilt, there were some terms that were defined for you.  But not

here. So that's why we—that's why we can just throw out there all kinds of possibilities.

You are being asked to sentence [Petitioner] to death based on the phrase that no one can tell you what it means. All we know is "probability," again, is beyond a reasonable doubt. What does that mean?

Throughout the course of the trial, throughout the questioning, the State would throw out all these questions. Isn't is [sic] possible that? Isn't it possible that? All these horrible things that are possible. You know, none of that—none of that has anything to do with probable beyond a reasonable doubt.

Possibilities, random possibilities do not answer that question, especially when you don't know what that means. You know, really, you know more about your odds in Vegas when you walk up to the roulette wheel than you know about this. You know when you walk up to that table and bet, that red; that's going to be 50–50 chance, when they spin that wheel, that it will come up red. And are you ever going to bet your entire life savings on that? Would you bet your life on those kinds of odds? Would you bet somebody else's life on those kinds of odds? No, you can't. But you are being asked by the State to bet my client's life on odds that are less than that that we don't even know about.

75 Rep. R. 91–93. The prosecution maintained that it had proven that

Petitioner would "probably" commit future acts of violence: "He killed

before; he killed this time . . . . And he is trying to kill again." *Id.* at 158.

In his state habeas application, Petitioner claimed that his counsel provided ineffective assistance when they failed to object to the prosecutor's definition of "probability." 1 State Habeas R. 14, 71–78. During testimony in Petitioner's state habeas corpus proceeding, Petitioner's lead trial counsel acknowledged that the proper definition of "probability," as used in the future dangerousness special issue, was unsettled and that some opinions of the Texas Court of Criminal Appeals suggested the term can be defined as "more than a mere possibility." 2 State Habeas R. 579–80. The state habeas trial court agreed and concluded that defense counsel's performance was not deficient:

- The term "probability" in the context of capital murder punishment issue is not statutorily defined.

- The Court of Criminal Appeals has varying definitions in its opinions, to include "more than a mere possibility," "more likely than not," "something more than a possibility," and "more than a bare chance."

- The law in this regard is not well-settled nor clearly defined.

- The definitions used by both the [Petitioner] and the [S]tate are definitions approved and utilized by the Court of Criminal Appeals. These terms are not improper nor an incorrect statement of the law.

- The [S]tate's use of the definition "more likely than not," and the defense attorneys failure to object during the punishment phase does not fall below the reasonable standards for legal representation in a death penalty case not [sic] does it constitute deficient performance or ineffective assistance of counsel.

2 State Habeas R. 584. The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it rejected this assertion of ineffective assistance on the merits in the course of Petitioner's state habeas corpus proceeding. *Ex parte Fabian Hernandez*, 2015 WL 376357, at *1.

    *b.    Analysis*

In evaluating a Texas petitioner's claim regarding the performance of his trial counsel that a state court rejects on the merits, the issue before the federal habeas court is whether the Texas Court of

Criminal Appeals reasonably concluded the petitioner's claim failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003).

As Respondent correctly highlights, the Texas Court of Criminal Appeals employs a variety of phrases to flesh out the term "probability" as that term is used in the Texas future dangerousness capital sentencing special issue. Answer 47. At the time of Petitioner's trial, the Court of Criminal Appeals had defined "probability" in this context in the following ways: "more than a mere possibility," *Murphy v. State*, 112 S.W.3d 592, 600 (Tex. Crim. App. 2003); "proof of more than a bare chance of future violence," *Ellason v. State*, 815 S.W.2d 656, 659 (Tex. Crim. App. 1991); "more than a 'possibility,'" *Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1992); "more than a bare chance of future violence," *Smith v. State*, 779 S.W.2d 417, 421 (Tex. Crim. App. 1989); "something between potential and more likely than not," *Cuevas v. State*, 742 S.W.2d 331, 346–47 (Tex. Crim. App. 1987), *overruled on other grounds in Hughes v. State*, 878 S.W.2d at 142; and "more likely than not," *Robison v. State*, 888 S.W.2d 473, 481 (Tex. Crim. App. 1994).

Thus, there was no legitimate legal basis for an objection to the prosecution's use of the phrase "more than a mere possibility" to explain the term "probability" to potential jurors during individual voir dire or during the prosecution's arguments at the punishment phase of trial. Hence, Petitioner's trial counsel cannot reasonably be faulted for failing to make a futile objection. *See Miller v. Thaler*, 714 F.3d 897, 904 n.6 (5th Cir. 2013) ("[C]ounsel is not required to make futile motions or objections[.]") (quoting *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *Roberts v. Thaler*, 681 F.3d 597, 612 (5th Cir. 2012) ("[T]he failure to lodge futile objections does not qualify as ineffective assistance . . . .") (citing *Koch*, 907 F.2d at 527); *Ward v. Dretke*, 420 F.3d 479, 498 (5th Cir. 2005) (explaining that counsel is not ineffective for failing to lodge what would likely have been a futile objection). Moreover, Petitioner has presented the Court with no evidence, much less clear and convincing evidence, showing that any of the state habeas trial court's factual findings made in connection with this claim of ineffective assistance were unreasonable or in any manner inaccurate or erroneous.

Therefore, the Court concludes that there was nothing objectively unreasonable about the failure of Petitioner's trial counsel to object to the prosecution's use of a definition of "probability," which the highest state appellate court had expressly endorsed in the context of the Texas future dangerousness special issue. *See Clark v. Thaler*, 673 F.3d 410, 429 (5th Cir. 2012) ("[F]ailure to assert a meritless objection cannot be grounds for a finding of deficient performance."); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009).

Given that the state habeas trial court did not specifically address the prejudice prong of the *Strickland* analysis when it rejected Petitioner's claim, the Court will conduct a *de novo* analysis of the second prong. *See Porter*, 558 U.S. at 39; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534. As explained in great detail above, the Texas Court of Criminal Appeals had endorsed the phrase "more than a mere possibility" as an acceptable definition or explanation of the term "probability" as used in the future dangerousness special issue many years before Petitioner's trial. *See Murphy*, 112 S.W.3d at 600. Thus, the failure of Petitioner's trial counsel to make a futile objection did not

"prejudice" Petitioner within the meaning of *Strickland* analysis. *See Segundo*, 831 F.3d at 350–51; *Paredes*, 574 F.3d at 291. Consequently, after completing a de novo review, the Court independently concludes there is no reasonable probability that, but for the failure of Petitioner's trial counsel to object to the prosecution's use of the phrase "more than a mere possibility" to explain or define the term "probability," the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.

### c.    Conclusion

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's claim that his trial counsel did not timely object to the prosecution's use of the phrase "more than a mere possibility" to define the term "probability" during voir dire and closing argument at the punishment phase of trial, was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Moreover, it did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas corpus

proceeding. The Court's independent and *de novo* review establishes that this claim satisfies neither prong of *Strickland* analysis. Accordingly, the Court concludes that Petitioner's third assertion of ineffective assistance in his Amended Petition does not warrant federal habeas corpus relief.

3. <u>Ground 1d – Trial Counsel Provided Ineffective Assistance by Failing to Object to the Absence of a "Beyond a Reasonable Doubt" Burden of Proof on the Prosecution for the Mitigation Special Issue.</u>

In his fourth claim of alleged ineffective assistance by his trial counsel during the punishment phase, Petitioner argues that his trial counsel should have objected to the state trial court's failure to instruct the jury that the prosecution bears the burden of proving a negative answer to the mitigation special issue "beyond a reasonable doubt." Am. Petition 30–39.

a. *State Court Disposition*

Prior to trial, Petitioner's trial counsel filed a comprehensive motion asking the state trial court to declare the Texas capital sentencing scheme unconstitutional on its face. 1 Clerk's R. 122–52. Petitioner also filed a separate motion specifically challenging the

failure of the Texas capital sentencing special issues to impose a "beyond a reasonable doubt" burden of proof on the prosecution in connection with the mitigation special issue. 1 Clerk's R. 161–64. On September 1, 2009, the state trial court denied both motions. 36 Rep. R. 42–57, 67–69, 77–86.

During the charge conference at the punishment phase of trial, Petitioner's trial counsel formally objected to the proposed charge and made a written request for a jury instruction imposing a "beyond a reasonable doubt" burden of proof on the prosecution in connection with the mitigation special issue; the state trial court overruled defense counsel's objection and denied their request. 3 Clerk's R. 1112–14; 75 Rep. R. 41–56.

Petitioner presented the same claims concerning the performance of his trial counsel in his state habeas corpus application. 1 State Habeas R. 14, 85–95. The state habeas trial court expressly found that Petitioner's trial counsel requested, both in writing and orally, that the state trial court instruct the jury at the punishment phase of trial that the prosecution was required to negate, beyond a reasonable doubt, the

existence of a fact or circumstance that would justify a life sentence rather than death, and the state trial court denied those requests and refused to submit the instruction.  2 State Habeas R. 580.[14]  The state habeas trial court concluded that the instruction on the burden of proof applicable to the mitigation special issue requested by Petitioner's state habeas counsel was substantially similar to the instruction requested by Petitioner's trial counsel, and that Petitioner was not entitled to an instruction imposing a beyond a reasonable doubt burden of proof on the prosecution in connection with the mitigation special issue.  2 State Habeas R. 585.  The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it rejected this assertion of ineffective assistance on the merits in the course of Petitioner's state habeas corpus proceeding.  *Ex parte Fabian Hernandez*, 2015 WL 376357, at *1.

---

[14] For unknown reasons, the state habeas trial court listed these findings under Petitioner's eighth ground for state habeas relief.  These findings, however, clearly relate to Petitioner's ninth ground for state habeas relief.

*b.    Analysis*

Petitioner has presented no evidence, much less clear and convincing evidence, demonstrating that any of the state habeas trial court's factual findings listed above were inaccurate or erroneous.  On the contrary, the Court's independent review of the record shows that Petitioner's trial counsel did everything reasonably possible to raise and preserve for state appellate review Petitioner's argument that the punishment-phase jury instructions failed to impose a beyond a reasonable doubt burden of proof on the prosecution to prove a negative answer to the mitigation special issue.

To the extent that Petitioner argues that his trial counsel failed to object to the absence of a burden of proof instruction on the mitigation special issue, Petitioner's ineffective-assistance claim is factually inaccurate.  As detailed above, Petitioner's trial counsel submitted a formal written request for a jury instruction imposing a beyond a reasonable doubt burden of proof on the prosecution in connection with the mitigation special issue, argued in favor of such a requirement, and obtained a state trial court ruling on the issue during the punishment-

phase charge conference. Petitioner's trial counsel undertook the appropriate and required legal steps to preserve the very legal issue Petitioner now claims his trial counsel failed to properly raise for state appellate review. The Court concludes after an independent and *de novo* review that this ineffective-assistance-of-counsel claim fails to satisfy the deficient-performance prong of the *Strickland* analysis.

Insofar as Petitioner argues that he was constitutionally entitled to have the state trial court instruct the jury that the prosecution had the burden of proving a negative answer to the mitigation special issue beyond a reasonable doubt, Petitioner's argument is flawed. As the Fifth Circuit and other sister district courts have explained on many occasions, there is not now, nor has there ever been, a constitutional duty on the prosecution, in a Texas capital murder trial, to disprove the existence of mitigating evidence warranting a sentence of life imprisonment. *See, e.g.*, *Blue*, 665 F.3d at 668 ("No Supreme Court or Circuit precedent constitutionally requires that Texas' mitigation special issue be assigned a burden of proof."); *Druery v. Thaler*, 647 F.3d 535, 546 (5th Cir. 2011) (noting that the Fifth Circuit has rejected a

petitioner's arguments "that allowing a sentence of death without a jury finding beyond a reasonable doubt that there were no mitigating circumstances sufficient to warrant a sentence of life imprisonment violated his Sixth and Fourteenth Amendment right to due process and a fair trial" and that failure to instruct the jury that the State has the burden of proof beyond a reasonable doubt on the mitigation issue is unconstitutional) (citations omitted); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006); *Rowell v. Dretke,* 398 F.3d 370, 378 (5th Cir. 2005); *Garza v. Thaler*, 909 F.Supp.2d 578, 674–79 (W.D. Tex. 2012) (explaining why the Supreme Court's opinions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000)*, Ring v. Arizona*, 536 U.S. 584 (2002)*,* and *Blakely v. Washington*, 542 U.S. 296 (2004), do not mandate imposing a burden of proof on the prosecution in connection with the Texas capital sentencing scheme's mitigation special issue).

A jury's answer to the Texas capital sentencing scheme's mitigation special issue does not render the defendant "eligible" for a death sentence. *Garza*, 909 F.Supp.2d at 674–79. Instead, that constitutionally required determination is accomplished at the guilt-

innocence phase of trial when the jury finds a Texas capital murder defendant guilty beyond a reasonable doubt. *See Johnson v. Texas*, 509 U.S. 350, 362 (1993) (holding that the Texas capital sentencing scheme accomplishes the eligibility determination, the constitutionally required "narrowing function," at the guilt-innocence phase of trial). As a federal district court in San Antonio has explained, "[t]he Texas capital sentencing scheme's 'mitigation' Special Issue serves not to render the defendant eligible for the death penalty or to 'select' the defendant for execution; rather, it allows the capital sentencing jury unfettered discretion to dispense an act of grace to the otherwise condemned defendant." *Hernandez v. Thaler*, 2011 WL 4437091, at *54 (W.D. Tex. Sept. 23, 2011), *modified on reh'g*, 2012 WL 394597 (W.D. Tex. Feb. 6, 2012), *aff'd sub nom.*, 537 F. App'x 531 (5th Cir. Aug. 2, 2013).

The constitutional argument underlying Petitioner's fourth ineffective-assistance claim is without legal merit. Even if his trial counsel had failed to raise such a claim, Petitioner would not have been prejudiced. *See Segundo*, 831 F.3d at 350–51; *Paredes*, 574 F.3d at 291.

*c.    Conclusion*

The Texas Court of Criminal Appeals' rejection on the merits of Petitioner's claim that his trial counsel did not timely object to the absence of a burden of proof instruction in connection with the mitigation special issue, was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. The Texas Court of Criminal Appeals' ruling also did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas proceeding. Furthermore, the Court's independent and *de novo* review establishes that this claim satisfies neither prong of the *Strickland* analysis. Hence, the Court concludes that Petitioner's fourth assertion of ineffective assistance does not warrant federal habeas corpus relief.

4.    <u>Ground 1e – Trial Counsel Provided Ineffective Assistance by Failing to Adequately Investigate Petitioner's Mental Health and Present Available Mitigating Evidence of Organic Brain Damage.</u>

In his fifth claim of ineffective assistance by his trial counsel, Petitioner argues that his trial counsel failed to adequately investigate

Petitioner's mental health and present available evidence showing Petitioner suffers from organic brain damage.  Am. Pet. 39–45.

### a.  *Procedural Default on Unexhausted Claim*

Respondent correctly asserts that because Petitioner has not raised this claim in any state court proceeding—on direct appeal or in state habeas—it is unexhausted.  Answer 53.

Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights.  28 U.S.C. § 2254(b)(1); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  To provide the State with this necessary "opportunity," the prisoner must "fairly present" his claim to the appropriate state court in a manner that alerts that court to the federal nature of the claim.  *See Baldwin*, 541 U.S. at 29–32 (rejecting the argument that a petitioner "fairly presents" a federal claim, despite failing to give any indication in his appellate brief of the federal nature of the claim through reference

to any federal source of law, when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion); *O'Sullivan*, 526 U.S. at 844–45 (holding comity requires that a state prisoner present the state courts with the first opportunity to review a federal claim by invoking one complete round of that State's established appellate review process); *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996) (holding that, for purposes of exhausting state remedies, a claim for *federal* relief must include reference to a specific constitutional guarantee, as well as a statement of facts that entitle the petitioner to relief and rejecting the contention that the exhaustion requirement is satisfied by presenting the state courts only with the facts necessary to state a claim for relief).  The exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts and, thereby, to protect the state courts' role in the enforcement of federal law and prevent the disruption of state judicial proceedings.  *Carey v. Saffold*, 536 U.S. 214, 220 (2002);

*Duncan v. Walker*, 533 U.S. 167, 179 (2001); *O'Sullivan*, 526 U.S. at 845; *Rose v. Lundy*, 455 U.S. 509, 518–19 (1982).

Pursuant to AEDPA, federal courts lack the power to grant habeas corpus relief on unexhausted claims. *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003) (explaining that "28 U.S.C. § 2254(b)(1) requires that federal habeas petitioners fully exhaust remedies available in state court before proceeding in federal court"); *Riley v. Cockrell*, 339 F.3d 308, 318 (5th Cir. 2003); *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003); *Henry v. Cockrell*, 327 F.3d 429, 432 (5th Cir. 2003) ("Absent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."); *Mercadel v. Johnson*, 179 F.3d 271, 276–77 (5th Cir. 1999); *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998); *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998). The exhaustion of *all* federal claims in state court is a fundamental prerequisite to requesting federal collateral relief pursuant to § 2254. 28 U.S.C. § 2254(b)(1)(A); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001); *Sterling v. Scott*, 57 F.3d 451, 453 (5th Cir. 1995). However, 28 U.S.C. § 2254(b)(2)

empowers a federal habeas court to deny an unexhausted claim on the merits. *Pondexter v. Quarterman*, 537 F.3d 511, 527 (5th Cir. 2008); *Moreno v. Dretke*, 450 F.3d 158, 166 (5th Cir. 2006); *Daniel v. Cockrell*, 283 F.3d 697, 701–02 (5th Cir. 2002).

The exhaustion requirement is satisfied when the substance of the *federal* habeas claim has been "fairly presented" to the highest state court—that is, when the petitioner presents his claims before the state courts in a procedurally proper manner according to the rules of the state courts. *Baldwin*, 541 U.S. at 29–32 (holding that a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of counsel "ineffective," without accompanying that label with either a reference to *federal* law or a citation to an opinion applying *federal* law to such a claim); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002); *Mercadel*, 179 F.3d at 275. However, the petitioner need not spell out each syllable of the claim before the state court for the claim to have been "fairly presented," thereby fulfilling the exhaustion requirement. *Riley*, 339 F.3d at 318; *Fisher v. Texas*, 169 F.3d 295, 303 (5th Cir. 1999).

If a petitioner presents new legal theories or factual claims in his federal habeas petition, he has not met the exhaustion requirement. *Anderson v. Harless*, 459 U.S. 4, 6–7 (1982); *Scott v. Hubert*, 635 F.3d 659, 667 (5th Cir. 2011); *Riley*, 339 F.3d at 318 ("It is not enough that the facts applicable to the federal claims were all before the state court, or that the petitioner made a similar state-law based claim. The federal claim must be the 'substantial equivalent' of the claim brought before the [s]tate court."); *Wilder*, 274 F.3d at 259 ("[W]here [a] petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement . . . ."); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001). Likewise, to have "fairly presented" his *federal* claim, the petitioner must have reasonably alerted the state courts to the *federal* nature of his claim. *Baldwin*, 541 U.S. at 29–32; *Wilder*, 274 F.3d at 260 ("A fleeting reference to the federal constitution, tacked onto the end of a lengthy, purely state-law evidentiary argument, does not sufficiently alert and afford a state court the opportunity to address an alleged violation of federal rights.").

In Texas, the highest state court with jurisdiction to review the validity of a state criminal conviction is the Texas Court of Criminal Appeals. *Richardson v. Procunier*, 762 F.2d 429, 431–32 (5th Cir. 1985). The Fifth Circuit has consistently held that federal habeas review on unexhausted claims presented by a convicted Texas criminal defendant is barred pursuant to the procedural default doctrine. *See, e.g., Beatty v. Stephens*, 759 F.3d 455, 465 (5th Cir. 2014) (explaining that a Texas petitioner who failed to raise an ineffective-assistance claim during his first state habeas corpus proceeding would be precluded, pursuant to Texas Code of Criminal Procedure Article 11.071, § 5, from returning to state court to litigate the same claim and procedurally defaulted on claim in federal habeas corpus proceeding); *Trottie v. Stephens*, 720 F.3d 231, 248 (5th Cir. 2013) (holding that the petitioner's failure to fairly present factual basis underlying an ineffective-assistance claim in his state habeas corpus action rendered it unexhausted and procedurally defaulted); *Bagwell v. Dretke*, 372 F.3d 748, 755–56 (5th Cir. 2004).

The Texas Code of Criminal Procedure prohibits a successive state habeas corpus application except in limited circumstances where

> (1)   the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

> (2)   by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

> (3)   by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial . . . .

Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a) (West 2017). These limited circumstances do not apply to Petitioner's claim that his trial counsel failed to adequately investigate Petitioner's mental health. Nothing prevented Petitioner from fairly presenting his fifth assertion of ineffective assistance in his federal habeas petition in his state habeas corpus application. Texas law precludes Petitioner from

-102-

returning to state court at this juncture and exhausting state habeas remedies. *See id.* Therefore, Petitioner has procedurally defaulted on his unexhausted, fifth assertion of ineffective assistance by his trial counsel.

The Supreme Court has recognized exceptions to the doctrine of procedural default where a federal habeas corpus petitioner can show either (1) "cause and actual prejudice" for his default or (2) that failure to address the merits of his procedurally defaulted claim will work a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

To establish "cause," a petitioner must show either that some objective external factor impeded the defense counsel's ability to comply with the state's procedural rules or that petitioner's trial or appellate counsel rendered ineffective assistance. *Coleman v. Thompson*, 501 U.S. at 753; *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (holding that proof of ineffective assistance by counsel satisfies the "cause" prong of the exception to the procedural default doctrine).

In order to satisfy the "miscarriage of justice" test, the petitioner must supplement his constitutional claim with a colorable showing of factual innocence. *Sawyer v. Whitley*, 505 U.S. 333, 335–36 (1992). In the context of the punishment phase of a capital trial, the Supreme Court has held that a showing of "actual innocence" is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable state law. *Sawyer*, 505 U.S. at 346–48. The Supreme Court has explained that this "actual innocence" requirement focuses on those elements that render a defendant *eligible* for the death penalty and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. *Id.* at 347.

In *Martinez v. Ryan*, the Supreme Court held that "a procedural default will not bar a federal habeas court from hearing a *substantial claim* of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 566 U.S. 1, 17 (2012) (emphasis added). In

*Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013), the Supreme Court added, "where, as here, state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal, our holding in *Martinez* applies."

Petitioner's unexhausted fifth ineffective-assistance claim is not entitled to merits review from the Court pursuant to the rules announced in *Martinez v. Ryan* and *Trevino v. Thaler* because, as explained below, Petitioner's claim is insubstantial and lacks merit. *See Beatty*, 759 F.3d at 465–66 ("To succeed in establishing cause under *Trevino* and *Martinez,* the petitioner must show: (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (i.e., 'has some merit'); and (2) that his habeas counsel was ineffective for failing to present those claims in his first state habeas application.").

Because no state court has addressed Petitioner's unexhausted fifth ineffective-assistance claim, the Court's review is *de novo*. *See Porter*, 558 U.S. at 39; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at

534.  Petitioner's fifth assertion of ineffective assistance by his trial counsel currently remains unexhausted and is therefore procedurally defaulted.  Moreover, Petitioner has alleged no facts demonstrating that either of the longstanding exceptions to the procedural default doctrine discussed above excuse his failure to exhaust state habeas remedies on this particular assertion of ineffective assistance by his trial counsel.

> b.  *Alternatively Petitioner's Argument fails on the Merits*

Alternatively, even if the Court were to find that Petitioner's ineffective-assistance claim is not procedurally defaulted, the Court nevertheless finds that Plaintiff's claim similarly fails on the merits for the reasons set forth below.

In evaluating the performance of Petitioner's trial counsel during the punishment phase of trial, the Court must necessarily evaluate that performance within the context of the information reasonably available to counsel at that time.  *See Neal v. Puckett*, 286 F.3d 230, 237 (5th Cir. 2002) (recognizing that, in evaluating the performance of trial counsel against a claim that counsel failed to investigate and present mitigating evidence, the relevant inquiry focuses on what counsel did to prepare

for sentencing, what mitigating evidence counsel accumulated, what additional leads counsel had, and the results said counsel might reasonably have expected from those leads).

As previously noted, Petitioner's trial counsel presented a thorough case in mitigation at the punishment phase of trial, presented numerous members of Petitioner's family, a former co-worker, childhood and adult friends (including one of the two people targeted in the "hit letter" intercepted inside the El Paso County Jail while Petitioner was awaiting trial), a prison classification expert, and a forensic psychologist. Petitioner's family and friends testified extensively regarding the difficult childhood that Petitioner endured. Petitioner's family and friends portrayed him as a devoted father who diligently worked to support his children and endured verbal abuse from his unfaithful, alcoholic wife. In sum, Petitioner's trial counsel undertook every effort to humanize Petitioner.

Petitioner's trial counsel also presented expert testimony from a retired prison classification officer who opined that because of Petitioner's documented gang membership, if sentenced to a term of life

imprisonment without the possibility of parole, Petitioner would spend the rest of his life in administrative segregation in a maximum-security prison facility, where state prison officials would be able to control any risk of violent behavior.  73 Rep. R. 5–161.

Regarding Petitioner's mental health, the uncontroverted testimony of Petitioner's lead trial counsel during Petitioner's state habeas corpus proceeding and the documents accompanying Petitioner's state and federal habeas corpus pleadings establish that Petitioner's trial counsel conducted an extensive and thorough investigation into Petitioner's mental health.  More specifically, the evidence currently before the Court establishes that Petitioner's trial counsel had Petitioner evaluated by neuropsychologist Dr. Ann Salo, who concluded in her report that Petitioner displays narcissistic and antisocial personality traits, has an IQ of 87, is likely to over-respond to minor stress with temper outbursts, is impulsive, is unlikely to admit responsibility for his personal failures, and shows no evidence of significant cognitive dysfunction and only mild impairment of executive function.  Am. Pet. Ex. A.

Further, Petitioner's trial counsel also had Petitioner examined by Dr. Steven P. Glusman, who administered an EEG and reported a borderline abnormal result, which suggested that (1) Petitioner's mother used excessive amounts of alcohol during her pregnancy, (2) Petitioner had a history of intranasal cocaine abuse, (3) Petitioner had a history of polysubstance abuse and (4) Petitioner was diagnosed with antisocial personality disorder. Am. Pet. Ex. B.

Additionally, Petitioner's trial counsel had Petitioner evaluated by Dr. Natalicio, who reported that Petitioner

- scored a full scale 84 on a standardized IQ test instrument;

- displayed symptoms consistent with left frontal-left temporal lobe organic brain damage of unknown etiology;

- suffered a close head injury in a fall from a moving vehicle but received no medical attention;

- was diagnosed with scarlet fever and meningitis and spent an extended period in the hospital as a child;

- was likely to experience difficulty with planning and assessing even relatively uncomplicated undertakings; and

- was likely to experience repeated episodes of alcohol abuse as a means of self-medication.

Am. Pet. Ex. C.

Finally, Petitioner's trial counsel retained the services of forensic psychologist Dr. Cunningham, who testified at great length at trial regarding Petitioner's

- low level of intellectual functioning;

- exposure during childhood to alcoholic, violent parents;

- history of childhood head injuries, scarlet fever, and meningitis;

- history of inhalant abuse;

- genetic predisposition toward alcohol and drug abuse;

- exposure to the rejection of his mother by his father's relatives;

- history of emotional and physical abuse, emotional and supervisory neglect, and exposure to violence, drugs, and gangs;

- disturbed trajectory typified by school failure, dropping out school, teen alcohol and drug abuse, youth gang recruitment, delinquency, criminality, incarceration in early adulthood, disturbed marital relationship, and alcohol abuse proximate to a capital offense;

- youth gang membership;

- abuse of alcohol to self-medicate;

- diminished thought processes;

- impulsivity and poor judgment;

- antisocial personality disorder;

- lack of motivation to harm others once convicted of capital murder;

- history of non-violence during a prior period of incarceration;

- relatively non-violent record while awaiting trial;

- likely placement in administrative segregation where he would be under constant supervision;

- lack of personality characteristics suggestive of a likelihood of engaging in violence when in prison; and

- relatively mature age upon admission to prison.

74 Rep. R. 92–226, 274–387.

In sum, Petitioner's unexhausted argument that his trial counsel failed to adequately investigate his mental health is refuted by the objective evidence of the broad scope of the investigation into Petitioner's mental health undertaken by Petitioner's trial counsel. "The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992).

Given the extensive case in mitigation that Petitioner's trial counsel presented, including the lengthy expert testimony of Dr. Cunningham summarized above, the Court independently concludes that it was objectively reasonable for Petitioner's trial counsel not to pursue further mental health evidence regarding Petitioner's alleged organic brain damage. Objective testing, such as a brain scan revealing Petitioner's brain impairment, if any, would have added little to Dr. Cunningham's lengthy testimony about Petitioner's many developmental disadvantages and opinions that Petitioner showed significant deficits in intellectual functioning and social maturity. Moreover, such objective testing would have left unanswered the ultimate question of how Petitioner's brain became physically impaired—whether as a result of a childhood illness or head injury or as a result of Petitioner's own abuse of inhalants, cocaine, and alcohol. Petitioner does not allege any specific facts, much less furnish any evidence, showing it was possible to determine the etiology of Petitioner's organic brain damage, if any, at the time of Petitioner's capital murder trial.

Furthermore, the prosecution offered no rebuttal testimony after the defense rested at the punishment phase of Petitioner's capital murder trial. This left uncontroverted Dr. Cunningham's punishment-phase testimony that Petitioner suffered from diminished intellectual functioning and reduced thought processes; had a severely turbulent and disadvantaged childhood; had a history of childhood head trauma and illness, as well as childhood inhalant and alcohol abuse; had a genetic predisposition toward alcohol and drug abuse; and displayed impulsivity.

Petitioner's trial counsel had available to them all of the information summarized above in the pretrial reports of Drs. Salo, Natalicio, and Glusman; the pretrial testimony of Dr. Natalicio; and the trial testimony of Dr. Cunningham. Petitioner has alleged no facts demonstrating that it was objectively unreasonable for his trial counsel to have relied upon those reports in determining how best to proceed with their trial preparations, including deciding not to pursue a brain scan, as suggested by Dr. Glusman.

Moreover, Petitioner's attorneys had to consider the potential pitfalls posed by the *Lagrone/Soria* line of cases and the possibility that the presentation of some forms of mental health evidence might permit the admission of potentially harmful testimony on future dangerousness, such as Dr. Coons's testimony during the August 2009 pretrial hearing. During Petitioner's state habeas corpus proceeding, Petitioner's former lead trial counsel testified extensively that the defense team's strategic decision-making was circumscribed by its awareness of the impact of the *Lagrone/Soria* line of cases and its strong desire to avoid having Dr. Coons express at trial the opinions he had expressed during the pretrial hearing. 1 State Habeas R. 405–06, 409–15, 418, 422–24, 431–34, 436–38, 446, 448, 451, 453, 455–60, 462, 477, 482–83.

Under such circumstances, the Court concludes, after *de novo* review, that it was objectively reasonable for Petitioner's trial counsel to limit the scope of the defense team's investigation into Petitioner's background, and specifically Petitioner's mental health, to the scope of the investigation that counsel actually undertook. Trial counsel has

considerable discretion in terms of deciding how best to represent their client. "[T]he Supreme Court has emphasized that 'counsel has wide latitude in deciding how best to represent a client.'" *Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2011); *Clark*, 673 F.3d at 427 (citing *Yarbrough v. Gentry*, 540 U.S. 1, 5–6 (2003)). This wide latitude includes the discretion to determine how best to utilize the limited investigative resources available to defense counsel. *See Ward*, 777 F.3d at 264 (concluding that counsel made a "reasonable strategic decision 'to balance limited resources' and . . . focus on expensive clinical psychologists and forensic experts rather than on investigators); *Harrington*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies.").

Petitioner has failed to allege any specific facts, much less furnish any evidence, establishing that his defense counsel's decision not to pursue an independent mental health evaluation of Petitioner, further than the extensive investigation which counsel did conduct, was objectively unreasonable under the circumstances which existed as of

the time of Petitioner's 2009 capital murder trial. In short, Petitioner has failed to allege facts that overcome the strong presumption that his trial counsel's representation fell within the wide range of reasonable professional assistance.

As detailed at length above, Petitioner's trial counsel presented a thorough case in mitigation. *See supra* Section I.B. at 8–12; Section III.C.4.b. at 110–12. Having considered anew the prosecution's evidence presented during the capital murder trial, the mitigating evidence presented by Petitioner's trial counsel, as well as the additional mitigating evidence Petitioner's federal habeas counsel argues should also have been presented at trial, the Court concludes that Petitioner has failed to satisfy the "prejudice" prong of the *Strickland* analysis.

Consequently, the Court concludes there is no reasonable probability that, but for the failure of his trial counsel to more fully investigate Petitioner's mental health and present all then-available mental health evidence, the outcome of the punishment phase of Petitioner's capital murder trial would have been any different.

*c.    Conclusion*

Petitioner's unexhausted, procedurally defaulted, ineffective-assistance claim regarding the failure of his trial counsel to adequately investigate his mental health and present all available mitigating mental-health evidence fails to satisfy either prong of the *Strickland* analysis and does not warrant federal habeas corpus relief.  Petitioner's fifth assertion of ineffective assistance also fails to present a "substantial" claim of ineffective assistance by Petitioner's trial counsel under the standard announced in *Martinez* and *Trevino*.  *See Martinez*, 566 U.S. at 17–18; *Trevino*, 133 S. Ct. at 1921.

5.    Cumulative Effect

In an unnumbered argument, Petitioner asserts that the cumulative effect of the foregoing alleged instances of deficient performance by his trial counsel "prejudiced" him within the meaning of *Strickland*.  Am. Pet. 41–43.  For the reasons discussed at length above, none of Petitioner's five assertions of ineffective assistance by his trial counsel during the punishment phase of trial satisfy either prong of the *Strickland* analysis.  Thus, as Respondent concisely argues, "there is

nothing to cumulate."  Answer 60 (citing *United States v. Hall*, 455 F.3d 508, 520 (5th Cir. 2006) ("Our clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions."); *see also Miller v. Johnson,* 200 F.3d 274, 286 n.6 (5th Cir. 2000) (explaining that in the absence of specific demonstrated error, a defendant cannot, by definition, show that cumulative error of counsel deprived him of a fair trial).

### D.     Ground 2 – Appellate Counsel Provided Ineffective Assistance on Appeal.

In his second claim for federal habeas corpus relief, Petitioner claims that his state appellate counsel rendered ineffective assistance when he failed to object to the state trial court's decisions

> a.     to permit the expert testimony of [Dr. Coons], expressing the opinion that Petitioner would probably commit criminal acts of violence that constitute a continuing threat to society;

> b.     not to permit . . . AuBuchon, an expert in Texas prison classification, security, and housing of inmates, to express the professional opinion that Petitioner would not be a continuing threat to society if sentenced to a life of confinement, without parole, in the Texas prison system; and

> c.  to follow the Texas statutory rule in capital murder prosecutions which requires a jury instruction that punishment-phase issues may not be resolved in the defendant's favor unless at least ten jurors agree because of its coercive effect on jury deliberations.

Am. Pet. 47–63.

### 1.  Clearly Established Federal Law

The same two-pronged standard for evaluating ineffective-assistance claims against trial counsel announced in *Strickland* applies to claims concerning the performance of counsel on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Dorsey v. Stephens*, 720 F.3d 309, 319 (5th Cir. 2013) ("A criminal defendant has a constitutional right to receive effective assistance of counsel on his first appeal. In a direct appeal, ineffective assistance of counsel claims are governed by the standard established by the Supreme Court in *Strickland v. Washington*.") (footnotes omitted)).

Thus, the standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and

(2) whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of Petitioner's appeal would have been different. *Robbins*, 528 U.S. at 285; *Higgins v. Cain*, 720 F.3d 255, 260–61 (5th Cir. 2015). Appellate counsel who files a merits brief need not, and should not, raise every non-frivolous claim. *Robbins*, 528 U.S. at 288; *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Instead, he may select from among them in order to maximize the likelihood of success on appeal. *Id.* The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Barnes*, 463 U.S. at 751–52.

Nonetheless, appellate counsel is obligated to research relevant facts and law or to make an *informed* decision that certain avenues will not prove fruitful. *See Busby v. Dretke*, 359 F.3d 708, 714 (5th Cir. 2004); *United States v. Reinhart*, 357 F.3d 521, 525 (5th Cir. 2004); *Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003) (explaining that the failure to raise a discrete, purely legal issue, where the precedent could not be more pellucid or applicable, denies adequate

representation).  Likewise, solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the appellate court's attention.  *Reinhart*, 357 F.3d at 525; *Schaetzle*, 343 F.3d at 445.

2.  <u>Ground 2a. – Appellate Counsel Provided Ineffective Assistance by Failing to Challenge Pretrial Ruling on the Admissibility of Dr. Coons's Testimony.</u>

Petitioner argues that his appellate counsel should have asserted a point of error regarding the state trial court's pretrial ruling that Dr. Coons's opinions regarding Petitioner's future dangerousness would be admissible at trial.  Am. Pet. 47–53.

a.  *State Court Disposition*

As outlined above,[15] during a pretrial hearing held in August of 2009, the state trial court heard testimony from Dr. Coons regarding the methodology he employed in evaluating whether a defendant posed a risk of future dangerousness under the Texas capital sentencing scheme's first special issue and his opinion that, based upon his review of Petitioner's record, Petitioner would pose such a future danger.

---

[15] *See* Section III.A.1 *supra* at 34–35.

34 Rep. R. 13–82. At the conclusion of the hearing and after entertaining argument by the parties, the state trial court concluded that the reliability of Dr. Coons's testimony had been sufficiently established under applicable state evidentiary rules. 34 Rep. R 125–47. Ultimately, however, Dr. Coons's did not testify at Petitioner's trial.

Petitioner similarly argued in his state habeas corpus application that his state appellate counsel rendered ineffective assistance by failing to object to the state trial court's allegedly erroneous decision to permit Dr. Coons's testimony on future dangerousness.

1 State Habeas R. 13, 45–50. The state habeas trial court expressly found the following:

- Prior to trial, the [S]tate revealed that, if the defense produced expert psychiatric or psychological testimony at trial on any material issue in the case, it would call [Dr. Coons] as an expert psychiatric witness on the issue, among other things, whether [Petitioner] would be a danger to society in the future, and demanded that [Petitioner] submit to an unlimited pretrial psychiatric examination, including a personal interview, by Dr. Coons.

- [Petitioner] refused to be examined by any psychiatric expert for the State, including [Dr. Coons], regarding the issue of future dangerousness.

- On August 6, 2009, [Dr. Coons's] opinion as to [Petitioner's] future dangerousness was conducted regarding future-dangerousness in a method similarly considers [sic] in an unrelated case of *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010), *cert. denied*, 564 U.S. 1020. 131 S.Ct. 3030, 180 L.Ed.2d 846 (2011).

- At the conclusion of the pretrial hearing, over the objection of the defense, the court ruled that Dr. Coons would be permitted to examine [Petitioner] without limitation prior to trial and to testify during the punishment phase as an expert before the jury on the issue of future dangerousness.

- The defense engaged the services of three experts: [Dr. Natalicio] (Psychologist), Dr. Mark Cunningham (forensic psychologist) and . . . Aubuchon [sic] (inmate-classification expert) for the purpose to demonstrate that [Petitioner] was not a future danger and that his disadvantaged background and intellectual deficiencies would be sufficient mitigating circumstances to warrant life rather than death.

- During the trial the defense did not call Dr. Natalicio to testify.

- During the trial, the State did not call Dr. Coons to testify nor was any other psychiatric evidence as to [Petitioner's] future dangerousness presented.

- The defense presented the testimony of forensic psychologist Dr. Mark Cunningham, who testified that[,] based on the review of [Petitioner's] records

. . . [,] [Petitioner] was not a future danger while in prison.

- The defense further presented . . . AuBuchon, an inmate-classification expert to show that TDCJ could control [Petitioner] if he was sentenced to prison so as to show that the applicant was not a future danger while in prison.

- During the trial, the [S]tate presented overwhelming evidence of [Petitioner's] future dangerousness, to include not only the facts of this case but also that when [Petitioner] was 18 years of age he armed himself with a gun and engaged himself in a fight and killed a person; and the State also showed evidence of [Petitioner], a member of the Barrio Azteca prison gang that while awaiting the trial on this case sought to have other Barrio Azteca gang members kill two of the witnesses against [Petitioner] and assault others outside the jail. The [S]tate argued that this continued behavior and actions demonstrated [Petitioner's] continued threat to society.

- After [Petitioner's] trial in 2009, but before [Petitioner's] direct appeal in 2011, the Court of Criminal Appeals held in *Cobble v. State*, 330 S.W.3d at 270–80, that the State had failed to demonstrate the scientific reliability of Dr. Coons['s] methodology for predicting future dangerousness.

- Subsequently in the direct appeal of 2011, [Petitioner] did not assign as a point of error that [the state trial court] had abused its discretion by challenging [the state trial court's] pretrial ruling on the admissibility of Dr. Coons'[s] testimony.

2 State Habeas R. 575–76.

The state habeas trial court concluded that because Dr. Coons did not testify at trial, his opinions on Petitioner's future dangerousness did not contribute to the jury's affirmative answer to the future dangerousness special issue, and that Petitioner failed to show that an appellate argument regarding the state trial court's interlocutory ruling would have resulted in a reversal of Petitioner's conviction on direct appeal. 2 State Habeas R. 581. Accordingly, it recommended that the Texas Court of Criminal Appeals deny relief. *Id.* at 585. The Court of Criminal Appeals adopted the foregoing findings and conclusions when it similarly rejected this assertion of ineffective assistance on the merits in the course of Petitioner's state habeas corpus proceeding. *Ex parte Fabian Hernandez*, 2015 WL 376357, at *1.

### b. Analysis

Petitioner has presented the Court with no evidence, much less clear and convincing evidence, establishing that any of the state habeas trial court's factual findings made in connection with this claim of

ineffective assistance by Petitioner's appellate counsel were in any manner inaccurate or erroneous.

The state habeas trial court reasonably concluded that counsel's failure to present a point of error on direct appeal regarding an interlocutory pretrial ruling on the admissibility of opinion testimony that was never actually presented to the jury at trial was not objectively unreasonable. As Respondent correctly asserts, under applicable Texas law, any error in a pretrial ruling on the admissibility of evidence is rendered moot if the proffered evidence is not actually admitted during trial. Answer 66 (citing *Herron v. State*, 86 S.W.3d 621, 628 (Tex. Crim. App. 2002) (holding that a complaint about a state trial court's allegedly erroneous pretrial ruling on the admissibility of a defendant's videotaped statement was rendered moot when the statement was not introduced into evidence at trial)).

Here, Dr. Coons's opinion on Petitioner's future dangerousness was never presented at trial. Thus, Petitioner's state appellate counsel could reasonably have concluded that asserting a point of error addressing the state trial court's allegedly erroneous pretrial ruling on

the admissibility of Dr. Coons's testimony would have been futile. Petitioner's state appellate counsel cannot reasonably be faulted for failing to present a point of error clearly foreclosed by applicable Texas law. *See Clark*, 673 F.3d at 429 ("[F]ailure to assert a meritless objection cannot be grounds for a finding of deficient performance."); *see also Paredes*, 574 F.3d at 291; *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007); *Johnson v. Cockrell*, 306 F.3d at 255 (all holding the same).

The Court likewise concludes, after *de novo* review, that there was nothing objectively unreasonable about appellate counsel's decision not to raise a point of error disputing a pretrial ruling on the admissibility of evidence that was never admitted at trial.

The state habeas trial court also reasonably concluded that the failure of Petitioner's appellate counsel to raise a point of error regarding the allegedly erroneous pretrial ruling on the admissibility of Dr. Coons's opinion on Petitioner's future dangerousness did not satisfy the prejudice prong of the *Strickland* analysis. Given the state law authorities discussed above, there is no reasonable probability that a

point of error disputing an interlocutory ruling on the admissibility of evidence that was never actually admitted at trial would have resulted in the reversal of Petitioner's conviction on direct appeal.

The Court likewise concludes, after *do novo* review, that there is no reasonable probability that, but for the failure of Petitioner's appellate counsel to include a point of error in Petitioner's appellate brief disputing the state trial court's pretrial ruling on the admissibility of Dr. Coons's opinion testimony, the outcome of Petitioner's direct appeal would have been different. Given applicable state law, it is highly unlikely that the Texas Court of Criminal Appeals would have reversed Petitioner's conviction or sentence based upon alleged error in a pretrial ruling on the admissibility of testimony never actually presented to the jury.

### c. *Conclusion*

The Texas Court of Criminal Appeals' rejection on the merits of this claim of ineffective assistance by Petitioner's state appellate counsel was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the

Supreme Court. The Texas Court of Criminal Appeals' decision was also not based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas corpus proceeding. The Court also independently concludes that this claim of ineffective appellate counsel fails to satisfy either prong of *Strickland* analysis. Consequently, the Court concludes that Petitioner's first assertion of ineffective assistance by his state appellate counsel does not warrant federal habeas corpus relief.

3. <u>Ground 2b – Appellate Counsel Provided Ineffective Assistance by Failing to Raise a Point of Error Challenging the Exclusion of the Opinion of AuBuchon Regarding Petitioner's Future Dangerousness.</u>

Petitioner also argues that his appellate counsel should have asserted a point or error objecting to the state trial court's refusal to admit AuBuchon's opinion when asked on re-direct examination whether "the defendant [would] commit criminal acts of violence that constitute a continuing threat to society[.]" Am. Pet. 53–57.

a. *State Court Disposition*

During his lengthy direct examination, defense prison classification expert AuBuchon testified that he believed that Petitioner

would spend the rest of his life in administrative segregation inside a maximum-security TDCJ prison facility. 73 Rep. R. 5–84. AuBuchon further testified that because of the restrictions on Petitioner's conduct in administrative segregation, and based upon his review of Petitioner's prison records from New Mexico, he believed that the TDCJ would be able to control Petitioner's behavior in administrative segregation, which would stop Petitioner from becoming a continuing threat to the prison population. *Id.* On re-direct examination of AuBuchon, Petitioner's trial counsel paraphrased the first special issue on future dangerousness to be answered by the jury. *Id.* at 135–36. The prosecution objected—initially on the ground that it was improper to ask the witness to opine about the ultimate issue before the jury. *Id.* at 136. After the state trial court excused the jury, the prosecution additionally objected to AuBuchon's lack of qualifications to render an opinion on the issue of future dangerousness. *Id.* at 138. The parties then conducted a voir dire examination of AuBuchon concerning his education, training, background, and the bases for his opinion on Petitioner's future dangerousness. *Id.* at 138–61. At the conclusion of

the parties' voir dire examination, the state trial court concluded that it did not believe AuBuchon had sufficient background or expertise to testify on the ultimate question raised by the first capital sentencing special issue. *Id.* at 162.

Petitioner similarly argued in his state habeas corpus application that his state appellate counsel rendered ineffective assistance by failing to assert a point of error based upon the state trial court's refusal to admit AuBuchon's opinion regarding Petitioner's future dangerousness. 1 State Habeas R. 14, 67–70. The state habeas trial court concluded that (1) AuBuchon was not qualified to express an opinion as to Petitioner's general future dangerousness or whether Petitioner would commit criminal acts of violence that would constitute a continuing threat to society; (2) the state trial court did not abuse its discretion in refusing to permit AuBuchon to express an opinion on Petitioner's general future dangerousness; and (3) Petitioner's appellate counsel did not render ineffective assistance in failing to raise such a claim. 2 State Habeas R. 583–84. The Texas Court of Criminal Appeals adopted the foregoing findings and conclusions when it rejected this

asserction of ineffective assistance on the merits in the course of Petitioner's state habeas corpus proceeding. *Ex parte Fabian Hernandez*, 2015 WL 376357, at *1.

b.    *Analysis*

Again, Petitioner has failed to present the Court with any evidence, much less clear and convincing evidence, establishing that any of the state habeas trial court's factual findings made in connection with this claim of ineffective assistance by Petitioner's appellate counsel were in any manner inaccurate or erroneous.

The state habeas trial court reasonably concluded that Petitioner's state appellate counsel did not render deficient performance by failing to assert a point of error challenging the exclusion of AuBuchon's opinion on the ultimate issue of Petitioner's general future dangerousness. Specifically, the state habeas trial court concluded that AuBuchon was not qualified under applicable state law, i.e., the *Lagrone/Soria* line of cases, to render an opinion on the ultimate issue of Petitioner's future dangerousness generally. 2 State Habeas R. 583–84. A state court's interpretation of state law binds a federal court

sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Paredes*, 574 F.3d at 291; *Wood*, 503 F.3d at 414.

Moreover, two weeks before Petitioner's state appellate counsel filed his state appellate brief, the Texas Court of Criminal Appeals rejected an almost identical point of error raised by Petitioner's own state appellate counsel in an earlier direct appeal in another case. *See Renteria v. State*, 2011 WL 1734067, at *38–40 (Tex. Crim. App. May 4, 2011), *cert denied* 565 U.S. 1263 (2012) (holding that any error in the exclusion of AuBuchon's opinion testimony regarding a defendant's general future dangerousness was rendered harmless by virtue of the fact that AuBuchon had been permitted to testify, as he did during Petitioner's trial, that the defendant in that case would not be a future danger in prison and Dr. Cunningham was permitted to testify, as he did during Petitioner's trial, that there was no probability the defendant in that case would commit criminal acts of violence while in prison).

The Court independently concludes, after *de novo* review, that there was nothing objectively unreasonable with Petitioner's state

appellate counsel's decision not to raise an argument concerning the exclusion of AuBuchon's opinion on Petitioner's future dangerousness; the Texas Court of Criminal Appeals had recently rejected a virtually identical argument raised by the same attorney in a prior direct appeal on behalf of another Texas death-row inmate. Upon the Court's examination of the two cases, the Court finds that the relevant facts in both cases are indistinguishable. AuBuchon testified without objection during Petitioner's trial that he did not believe Petitioner would commit criminal acts of violence in prison because TDCJ officials would send Petitioner to administrative segregation and Petitioner had not demonstrated violent behavior during a previous incarceration in New Mexico. 73 Rep. R. 80–84. Dr. Cunningham testified that he opined Petitioner would not commit future acts of criminal violence in prison. 74 Rep. R. 222–26, 274–306, 308, 310, 318, 328–29, 359, 361, 363–64, 371, 373, 379–81. Under such circumstances, Petitioner's state appellate counsel could have reasonably concluded that asserting a point of error complaining about the exclusion of AuBuchon's opinion on Petitioner's future dangerousness generally would be futile.

The state habeas trial court also reasonably concluded that this ineffective appellate assistance claim failed to satisfy the "prejudice" prong of the *Strickland* analysis. In view of the Texas Court of Criminal Appeals' holding in *Renteria*, the Court independently concludes, after *de novo* review, that there is no reasonable probability that, but for the failure of Petitioner's state appellate counsel to raise a point of error challenging the exclusion of AuBuchon's opinion on Petitioner's future dangerousness generally, the outcome of Petitioner's direct appeal would have been any different. No rational basis exists for believing that the Texas Court of Criminal Appeals' ultimate disposition of such a point of error in Petitioner's direct appeal would have been different from its holding of "harmless error" in *Renteria*. *See Renteria*, 2011 WL 1734067, at *38–40

Furthermore, the Court is bound on federal habeas review by the state habeas trial court's conclusion that AuBuchon was not qualified pursuant to state evidentiary rules to render an opinion on Petitioner's future dangerousness generally. Thus, Petitioner's second assertion of ineffective assistance by his appellate counsel amounts to little more

than a complaint that his appellate counsel failed to raise a point of error concerning the exclusion of opinion testimony by a witness who was not qualified to render such an opinion under state evidentiary rules. Accordingly, Petitioner was not "prejudiced" within the meaning of *Strickland* by such failure.

### c. Conclusion

The Texas Court of Criminal Appeals' rejection on the merits of this ineffective-assistance claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; nor was it based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas corpus proceeding. The Court independently concludes that this claim of ineffective appellate counsel fails to satisfy either prong of the *Strickland* analysis. Therefore, the Court concludes that Petitioner's second assertion of ineffective assistance by his state appellate counsel does not warrant federal habeas corpus relief.

4. <u>Ground 2c – Appellate Counsel Provided Ineffective Assistance by Failing to Challenge the Texas Twelve-Ten Rule.</u>

In his final assertion of ineffective assistance by his state appellate counsel, Petitioner contends that his counsel should have asserted a point of error on direct appeal challenging the constitutionality of the Texas twelve-ten rule. Am. Pet. 57–63. Petitioner's claim centers on the fact that the jury was not instructed on Texas's "one holdout juror rule"—that if it failed to answer either issue because ten to twelve votes could not be mustered, the judge would sentence Petitioner to life in prison. Tex. Code Crim. Proc. Ann. art. 37.071, § 2(g) (West 2017). Petitioner argues that the twelve-ten rule has a coercive effect on jury deliberations and discourages each juror from expressing an individual judgment, thus violating the Eighth Amendment.

*a. State Court Disposition*

Petitioner's trial counsel filed multiple motions challenging the provisions of the Texas capital sentencing statute requiring the jury to answer each special issue unanimously in favor of the prosecution or to

have at least ten jurors reach a verdict in favor of the defense on each special issue.  1 Clerk's R. 161–64; 2 Clerk's R. 553–73.  The state trial court denied these motions at a pretrial hearing held on September 1, 2009, and denied Petitioner's objections to the jury charge raising similar arguments during the punishment-phase charge conference. 36 Rep. R. 9–154; 75 Rep. R. 41–56.

In his state habeas corpus application, Petitioner argued that his state appellate counsel should have asserted a point of error on appeal challenging the constitutionality of the Texas twelve-ten rule.  1 State Habeas R. 14, 78–85.  The state habeas trial court made no express factual findings regarding this ineffective-assistance claim, but did conclude that the claim should be denied "in its entirety."[16]

_____

[16] While the state habeas trial court did issue two factual findings purporting to address this claim, 2 State Habeas R. 580, those factual findings actually address Petitioner's final claim for state habeas relief—his complaint that the mitigation special issue should have included a burden of proof imposed upon the prosecution.  In its conclusions of law section, the state trial habeas court did conclude, however, that (1) it submitted the Texas twelve-ten rule and accompanying jury instructions as required by applicable Texas statute, (2) Petitioner failed to show the twelve-ten rule and jury instructions, if challenged on direct appeal, would have resulted in the reversal of

-138-

*b.    Analysis*

The state habeas trial court reasonably concluded that this ineffective-assistance claim failed to satisfy the deficient-performance prong of the *Strickland* analysis.  Petitioner argues that the Texas twelve-ten rule suffers from a variety of constitutional infirmities, including (1) the failure of the rule to advise jurors of the impact of their failure to reach a unanimous verdict in favor of the prosecution on the Texas capital sentencing special issues or at least to have ten jurors reach agreement on an answer favorable to the defense, (2) the effect of the rule, which Petitioner argues forces jurors to agree upon specific mitigating factors when reaching their verdict, in violation of the rule announced in *Mills v. Maryland*, 486 U.S. 367 (1989),[17] and (3) the

---

Petitioner's conviction, and (3) this ground for state habeas relief should be denied in its entirety.  *Id.* at 584–85.

[17] "We conclude that there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.  Under our cases, the sentencer must be permitted to consider all mitigating evidence.  The possibility that a single juror

nature of the rule, which Petitioner alleges misleads jurors regarding the consequences of their votes, in violation of the rule announced in *Caldwell v, Mississippi*, 472 U.S. 320 (1985).[18]

Yet, the Texas Court of Criminal Appeals, the Fifth Circuit, and other courts within the district, have repeatedly rejected Petitioner's constitutional challenges to the Texas twelve-ten rule. *See, e.g.*, *Gamboa v. State*, 296 S.W.3d 574, 585–86 (Tex. Crim. App. 2009) (rejecting a challenge to the Texas twelve-ten rule's failure to instruct jury on the impact of a single holdout juror); *Saldana v. State*, 232 S.W.3d 77, 104–09 (Tex. Crim. App. 2007) (rejecting a wide array of constitutional challenges to the Texas capital sentencing statute including multiple challenges to the twelve-ten rule); *Threadgill v. State*, 146 S.W.3d 654, 673 (Tex. Crim. App. 2004) ("We have consistently held that '[t]here is no constitutional prohibition to concealing from the jurors the consequences of their deliberations, so

---

could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk."

[18] "We conclude that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."

long as they are not misled into believing that ultimate responsibility for the verdict rests elsewhere.'") (quoting *Prystash v. State,* 3 S.W.3d 522, 532 (Tex. Crim. App. 1999)).

The Supreme Court rejected the Eighth Amendment argument underlying Petitioner's final claim of ineffective appellate assistance in *Jones v. United States*, 527 U.S. 373, 382 (1999) (holding that the Eighth Amendment does *not* require that a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death). Petitioner has provided no Supreme Court case holding that the Constitution mandates a jury instruction of the type Petitioner now requests in this claim.

On numerous occasions, the Fifth Circuit has similarly rejected the Eighth Amendment argument underlying Petitioner's final claim that a Texas capital murder defendant is constitutionally entitled to

have his punishment-phase jury instructed regarding the consequences of a hung jury or a single holdout juror. *See, e.g.*, *Hughes v. Dretke*, 412 F.3d 582, 593–94 (5th Cir. 2005) (holding that the same arguments underlying Petitioner's final appellate ineffective-assistance claim herein were so legally insubstantial as to be unworthy of a certificate of appealability); *Alexander v. Johnson*, 211 F.3d 895, 897–98 (5th Cir. 2000) (holding that the *Teague v. Lane* non-retroactivity doctrine precluded applying such a rule in a federal habeas context); *Davis v. Scott*, 51 F.3d 457, 466–67 (5th Cir. 1995) (holding the same); *Jacobs v. Scott*, 31 F.3d 1319, 1328–29 (5th Cir. 1994) (rejecting application of the Supreme Court's holding in *Mills v. Maryland* to a Texas capital sentencing proceeding).

Petitioner's reliance upon the Supreme Court's holding in *Caldwell v. Mississippi,* 472 U.S. 320 (1985), is likewise misplaced. In *Caldwell*, the Supreme Court addressed an instance in which a capital murder prosecutor's jury argument suggested, in an erroneous and misleading manner, that the jury was *not* the final arbiter of the

defendant's fate.[19]  To establish a *Caldwell* violation, "a defendant

necessarily must show that the remarks to the jury improperly

described the role assigned to the jury by [state] law."  *See Dugger v.

Adams*, 489 U.S. 401, 407 (1989) (discussing 472 U.S. at 325).

Both the Fifth Circuit and other district courts have repeatedly

rejected efforts, identical to those of Petitioner, to shoe-horn the

Supreme Court's holding in *Caldwell* into the wholly dissimilar context

of the failure to inform jurors regarding the consequences of their

inability to reach a unanimous verdict.  *See, e.g.*, *Turner v. Quarterman*,

481 F.3d 292, 300 (5th Cir. 2007) (recognizing that Fifth Circuit

precedent foreclosed arguments that the Eighth Amendment and Due

Process Clause of the Fourteenth Amendment mandated jury

instructions regarding the effect of a capital sentencing jury's failure to

---

[19] Namely, in *Caldwell*, the Supreme Court held that the prosecution's
following statement, presented during its closing argument,
undermined reliable exercise of jury discretion:

> Now, [the defense] would have you believe that you're going
> to kill this man and they know—they know that your
> decision is not the final decision.  My God, how unfair can
> they be?  Your job is reviewable.  They know it.

472 U.S. at 329.

reach a unanimous verdict); *Barrientes v. Johnson*, 221 F.3d 741, 776–78 (5th Cir. 2000) (holding that a state trial court's voir dire instructions informing the jury that the court would impose the sentence, not the jury, but specifically explaining how the jury's answers to the capital sentencing special issues would require the court to impose either a sentence of life or death did not result in a *Caldwell* violation); *Hughes v. Johnson*, 191 F.3d 607, 618 (5th Cir. 1999) (holding that voir dire explanations to potential jurors of the impact of affirmative answers to the Texas capital sentencing special issues were sufficient to avoid any possibility that the jurors misunderstood their role or the effect of their punishment-phase verdict); *Alexander*, 211 F.3d at 897 n.5 (holding the same); *Bartee v. Quarterman*, 574 F.Supp.2d 624, 702–03 (W.D. Tex. 2008) (holding there is no constitutional right to have a capital sentencing jury informed of the effect of a hung jury); *Moore v. Quarterman*, 526 F.Supp.2d 654, 729–30 (W.D. Tex. 2007).

Likewise, Petitioner's reliance upon the Supreme Court's holdings in *McKoy v. North Carolina*[20] and *Mills* is unpersuasive. Petitioner's argument that the Texas twelve-ten rule violates the due process principles set forth in these opinions has repeatedly been rejected by both the Fifth Circuit and other district courts. *See Blue*, 665 F.3d at 669–70 (rejecting an Eight Amendment challenge to the Texas twelve-ten rule); *Alexander*, 211 F.3d at 897 (specifically rejecting both Fourteenth and Eighth Amendment challenges to the Texas twelve-ten rule in the course of affirming the district court's rejection of claims virtually identical to those raised by petitioner herein); *Miller v. Johnson*, 200 F.3d at 288–89 (holding *Mills* inapplicable to a Texas capital sentencing proceeding); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996) (holding the same); *Hughes v. Johnson*, 191 F.3d 607, 628–29 (5th Cir. 1999) (holding both *Mills* and *McKoy* inapplicable to the Texas capital sentencing scheme); *Jacobs*, 31 F.3d at 1328–29 ("Under the Texas system, all jurors can take into account any

---

[20] The Court in *McKoy v. North Carolina*, 494 U.S. 433, 444 (1990) held that "North Carolina's unanimity requirement impermissibly limits jurors' consideration of mitigating evidence and hence [was] contrary to [its] decision in *Mills*."

mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance. Thus, *Mills* is inapplicable."). Because the Texas capital sentencing scheme is vastly different from that employed in Maryland and North Carolina, Petitioner's reliance on the Supreme Court's opinions in *McKoy* and *Mills* applying the sentencing schemes from those states is misplaced. *See Alexander*, 211 F.3d at 897; *Miller v. Johnson*, 200 F.3d at 288–89; *Woods*, 75 F.3d at 1036; *Jacobs*, 31 F.3d at 1328–29.

The Court independently concludes, after *de novo* review, that there was nothing objectively unreasonable about the failure of Petitioner's state appellate counsel to assert the constitutional claims underlying Petitioner's third assertion of ineffective assistance by his appellate counsel. Prior to the date that Petitioner's state appellate brief was filed, all of Petitioner's federal constitutional challenges to the Texas twelve-ten rule had repeatedly been rejected by the Texas Court of Criminal Appeals, the Fifth Circuit, district courts, and even once by the Supreme Court.

Because all of the constitutional claims underlying this particular assertion of ineffective assistance by Petitioner's state appellate counsel have repeatedly been rejected on the merits by both the state and federal appellate courts, the state habeas trial court's decision that this ineffective-assistance claim failed to satisfy the prejudice prong of the *Strickland* analysis was objectively reasonable.

Consequently, the Court concludes that there is no reasonable probability that, but for the failure of Petitioner's state appellate counsel to assert the constitutional challenges to the Texas twelve-ten rule, the outcome of Petitioner's direct appeal would have been any different.

### c.      *Conclusion*

The Texas Court of Criminal Appeals' rejection on the merits of this claim of ineffective assistance by Petitioner's state appellate counsel was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; nor was it based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas

corpus proceeding. The Court independently concludes that this claim of ineffective appellate counsel fails to satisfy either prong of the *Strickland* analysis. Thus, Petitioner's final assertion of ineffective assistance by his state appellate counsel does not warrant federal habeas corpus relief.

Consequently, after reviewing all of Petitioner's federal habeas claims, the Court concludes that Petitioner is not entitled to federal habeas corpus relief.

## VII. REQUEST FOR A FEDERAL EVIDENTIARY HEARING

Petitioner has requested an evidentiary hearing to permit more factual development of his claims. Petitioner had a full and fair opportunity during the evidentiary hearing held in his state habeas corpus proceeding to present the state habeas trial court with any and all available evidence supporting his claims for state habeas corpus relief. Pursuant to AEDPA, the proper place for development of the facts supporting a claim is in the state court. *See Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (explaining that AEDPA clearly places the burden on a petitioner to raise and litigate as fully as

possible his federal claims in state court).  Furthermore, where a

petitioner's claims have been rejected on the merits, further factual

development in federal court is effectively precluded by virtue of the

Supreme Court's holding in *Cullen v. Pinholster*, 563 U.S. 170, 181–82

(2011):

> We now hold that review under § 2254(d)(1) is
> limited to the record that was before the state
> court that adjudicated the claim on the merits.
> Section 2254(d)(1) refers, in the past tense, to a
> state-court adjudication that "resulted in" a
> decision that was contrary to, or "involved" an
> unreasonable application of, established law.
> This backward-looking language requires an
> examination of the state-court decision at the
> time it was made.  It follows that the record
> under review is limited to the record in existence
> at that same time *i.e.,* the record before the state
> court.

Thus, Petitioner is not entitled to a federal evidentiary hearing on any

of his claims that were rejected on the merits by the state courts, either

on direct appeal or during Petitioner's state habeas corpus proceeding.

*See Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014).

Likewise, where a federal habeas corpus petitioner's claims lack

merit on their face, further factual development is not necessary.  *See*

*Register v. Thaler*, 681 F.3d 623, 627–30 (5th Cir. 2012) (recognizing that district courts possess discretion regarding whether to allow factual development, especially when confronted with claims foreclosed by applicable legal authority). The Court has conducted a *de novo* review of all of Petitioner's unexhausted ineffective-assistance claims and concludes that all of those claims lack merit.

"In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Richards v. Quarterman*, 566 F.3d 553, 562 (5th Cir. 2009) (quoting *Schriro v. Landrigan,* 550 U.S. at 468). "In determining whether to grant a hearing, under Rule 8(a) of the habeas Court Rules 'the judge must review the answer [and] any transcripts and records of state-court proceedings . . . to determine whether an evidentiary hearing is warranted.'" *Richards*, 566 F.3d at 562–63 (quoting *Hall v. Quarterman,* 534 F.3d 365, 368 (5th Cir. 2008). In making this determination, courts must consider whether an evidentiary hearing could "enable an applicant to prove the petition's factual allegations,

which, if true, would entitle the applicant to federal habeas relief."
*Richards*, 566 F.3d at 563 (quoting *Schriro,* 550 U.S. at 474).

Here, all but one of Petitioner's assertions of ineffective assistance by his state trial counsel and all of Petitioner's other claims were rejected on the merits during either Petitioner's direct appeal or state habeas corpus proceedings. Pursuant to *Pinholster*, he is not entitled to further evidentiary or factual development of those claims. Additionally, Petitioner's unexhausted *Wiggins* claim[21] is without legal merit and does not require factual or evidentiary development. In addition to being meritless, Petitioner's unexhausted *Wiggins* claim is procedurally defaulted and is not "substantial" for purposes of the *Ryan v. Martinez*[22] exception to the procedural default doctrine.

---

[21] *See Wiggins*, 539 U.S. at 534 ("In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.").

[22] *See Martinez*, 566 U.S. at 17 ("[A] procedural default will not bar a federal habeas court from hearing a *substantial* claim of ineffective assistance at trial if, in the [State's] initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.") (emphasis added).

Therefore, Petitioner is not entitled to an evidentiary hearing for the purpose of developing any of his claims herein. *See Segundo*, 831 F.3d at 350–51 ("Given the extent of the factual development during trial and during the state habeas proceedings, the district court did not abuse its discretion in determining it had sufficient evidence and declining to hold a hearing."). Petitioner fully developed all of his non-frivolous claims during his direct appeal or state habeas corpus proceeding, in which those claims were denied on the merits. Accordingly, he is not entitled to an evidentiary hearing before the Court.

## VIII. CERTIFICATE OF APPEALABILITY

Pursuant to AEDPA, before a petitioner may appeal the denial of a Section 2254 habeas corpus petition, the petitioner must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(2); *Miller-El v. Johnson*, 537 U.S. 322, 335–36 (2003). Likewise, pursuant to AEDPA, appellate review of a habeas petition is limited to the issues on which a certificate of appealability is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding that a certificate of appealability is

granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding that the scope of appellate review of denial of a habeas petition is limited to the issues on which certificate of appealability has been granted). In other words, a certificate of appealability is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which a certificate of appealability is granted. 28 U.S.C. § 2253(c)(3); *Crutcher*, 301 F.3d at 658 n.10.

A certificate of appealability will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Cockrell*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To make such a showing, the petitioner need *not* show that he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) that the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard*, 542 U.S. at 282; *Miller-El v. Cockrell*, 537 U.S. at

336.  The Court is required to issue or deny a certificate of appealability when it enters a final order, such as this one, adverse to a federal habeas petitioner.  Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.

The showing necessary to obtain a certificate of appealability on a particular claim is dependent upon the manner in which a district court has disposed of a claim.  "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484).  In a case in which the petitioner wishes to challenge on appeal a court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether the federal habeas court was correct in its procedural ruling.  *See Slack*, 529 U.S. at 484.

In death penalty cases, any doubt as to whether a certificate of appealability should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009); *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005). Nonetheless, a certificate of appealability is not automatically granted in every death penalty habeas case. *See Miller-El v. Cockrell*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course.").

The deferential standard of review applied to claims of ineffective assistance adjudicated on the merits in the state courts has particular force in evaluating the appealability of ineffective-assistance claims— the Supreme Court requires that federal courts "use a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 134 S. Ct. 10, 13 (2013); *Ward*, 777 F.3d at 259.

Reasonable minds could not disagree with the Court's conclusions that (1) all of Petitioner's claims concerning the performance of his trial counsel and state appellate counsel fail to satisfy the prejudice prong of *Strickland*, (2) the state habeas trial court reasonably concluded that all

of Petitioner's exhausted claims of ineffective assistance by his state trial counsel or state appellate counsel fail to satisfy the deficient-performance prong of the *Strickland* analysis, (3) Petitioner's unexhausted *Wiggins* claim fails to satisfy the prejudice prong of the *Strickland* analysis and is insubstantial under the standard announced in *Martinez v. Ryan*, (4) the Texas Court of Criminal Appeals reasonably rejected Petitioner's third through sixth claims herein on the merits during Petitioner's direct appeal, and (5) Petitioner is not entitled to a federal evidentiary hearing.

## IX.    CONCLUSION AND ORDERS

For the reasons discussed above, the Court concludes that Petitioner is not entitled to an evidentiary hearing, federal habeas corpus relief, or a certificate of appealability.  Accordingly, the Court enters the following orders:

**IT IS ORDERED** that Petitioner Fabian Hernandez's request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner Fabian Hernandez's "First Amended Petition for a Writ of Habeas Corpus"

(ECF No. 34) is **DENIED**, and his cause is **DISMISSED WITH PREJUDICE**.

IT IS FURTHER ORDERED that Petitioner Fabian Hernandez is **DENIED** a certificate of appealability.

IT IS FURTHER ORDERED that all pending motions are **DENIED AS MOOT**.

IT IS FINALLY ORDERED that the Clerk shall **CLOSE** this case.

SIGNED this **23rd** day of **May, 2017**.

_____
**PHILIP R. MARTINEZ**
**UNITED STATES DISTRICT JUDGE**